[Civ. No. 8905. First Appellate District, Division Two.—November 24, 1933.]

FRANK ARMAS et al., Respondents, v. CITY OF OAK-LAND (a Municipal Corporation), Appellant.

412

C. Stanley Wood, City Attorney, and John W. Collier, Senior Deputy City Attorney, for Appellant.

L. R. Weinmann, George P. Tobin and George J. Lacoste, as *Amici Curiae* on Behalf of Appellant.

Allen C. Cunha, Edward A. Cunha and Dean Cunha for Respondents.

Ivan Kelso and J. Allen Davis, as *Amici Curiae* on Behalf of Respondents.

NOURSE, P. J.—Plaintiffs sued for damages as heirs of Louise Armas, who was killed when struck by an automobile operated by a member of the fire department of the defendant city. The cause was tried by the court without a jury and the plaintiffs had judgment for $5,000. The appeal is taken on typewritten transcripts.

The appellant presents four grounds of appeal—insufficiency of the evidence to support the finding of negligence; insufficiency of the evidence to support the finding that deceased was not guilty of contributory negligence; excessive damages; and that section 1714½ of the Civil Code imposes no liability on cities for negligence in the operation of authorized emergency vehicles.

The motor vehicle causing the death was the property of the City of Oakland and was operated by the fire department of the city, being assigned to the battalion chief of the department. At the time of the accident it was being operated by a member of the department named Wainwright, who was carrying Chief Kispert to a fire in the Key Route Inn, located at Twenty-second and Broadway in the City of Oakland. The accident occurred at 3 o'clock in the afternoon of December 8, 1930; with the visibility clear. The chief and his assistant in response to a fire call were proceeding north on Broadway with the siren on the vehicle sounding continuously from the time they left the city hall. As they reached Nineteenth Street they found the east side of Broadway at Twentieth completely blocked by numerous automobiles and by two street-cars standing on the easterly rails. The westerly rails of the street-car line were clear, as was the westerly half of Broadway, excepting the portion close to the westerly curb where some automobiles were parked. Soon after crossing Nineteenth Street the fire car turned to the left, or westerly side of Broadway, and passed the standing street-cars on the left-hand side. After the fire car had crossed to the west side of Broadway two automobiles entered the intersection of Twentieth and Broadway, one entering from the west on Twentieth Street and making a turn on Broadway where it was double parked about twenty feet south of Twentieth Street. The other car entered the intersection from the north at the same time that the deceased appeared from in front of the standing street-cars at a point which might be called the pedestrian lane crossing Broadway on the southerly side of Twentieth Street. These two automobiles and the deceased all came into the view of the driver of the fire car when he was approximately seventy-five feet south of the intersection. He immediately applied his brakes, but the car collided with the second machine entering the intersection and struck the deceased with such force that she died soon after. There is no material conflict in the evidence. Some witnesses disagreed as to whether the chief's car struck the automobile before it struck the deceased, but this is immaterial as all witnesses agreed that the striking by both was almost simultaneous and that from the time that the driver of the chief's car saw these parties in the

intersection he used every possible means to avoid a collision with all of them.

It is difficult to reconcile the finding of want of contributory negligence with the undisputed facts in the record. At the time of the accident a great fire was burning within two blocks of the intersection. The vicinity of Twentieth and Broadway was thickly congested with an unusual number of people congregated on the sidewalks and on the easterly side of Broadway; though the electric traffic signals displayed the green light for crossing Broadway at the time the people were crossing Twentieth in such numbers that the deceased had difficulty in breaking through the crowd in order to leave the curb and enter the intersection. The fire car was painted a brilliant red and was sounding the siren continuously from the time it left the city hall. Witnesses standing near the intersection of Twentieth testified that they heard the siren when the car was three or four blocks distant; others testified that the street being clear of all other traffic, the fire car was seen coming as far as six blocks distant. There is not a word of testimony which tends to show that the deceased used any precaution for her own safety. A police officer was standing at a point near the easterly rail of the north-bound track on Broadway at what would be termed the southerly pedestrian lane; as the fire car approached from Fourteenth Street the people on the easterly side of Broadway surged into the street to see the approaching car; the officer ordered them back; the deceased pushed through the crowd, passed the officer and the standing street-cars, stopped at a point on the southerly car tracks which were clear of all traffic, backed away momentarily, then went forward, changing her directions twice before she was struck by the approaching car. We are familiar with the rule that the issue of contributory negligence is ordinarily one of fact which is to be determined by the court or jury and that such determination cannot be disturbed on appeal if there is any substantial evidence supporting it. Here the evidence shows a complete want of ordinary or any care on the part of the deceased; a total failure to use any precaution for her own safety. But more than this, the evidence shows that the deceased, while in a position of safety, after having been fully warned of the approaching danger left the position

of safety without care or caution for her own safety and entered the place of greatest peril. If the deceased knew or in the exercise of ordinary prudence should have known that the fire car was approaching on the westerly or left-hand side of the street, her conduct in attempting to cross the street in face of the peril was clearly negligent. The standing street-cars and automobiles and the crowd of people blocking the easterly side of the street would seem to be sufficient to cause her to know that the fire car would have to pass the intersection on the westerly side of Broadway.

But the judgment must be reversed upon grounds not related to the issue of the contributory negligence of the deceased. The liability which is sought to be imposed upon the city rests upon the doctrine of *respondeat superior*, which respondent argues is found in section 1714½ of the Civil Code. This liability, it is claimed, arises out of the asserted negligence of the fire car, which in turn rests solely upon the disregard of certain traffic regulations covering the operation of motor vehicles in general on the public highways and found in the California Vehicle Act. Section 1714½ of the Civil Code, which was enacted in 1929, was designed to remove the state and all political subdivisions and municipal corporations from the well-settled rule of nonliability in cases of tort arising out of purely governmental functions. This section declares that the state and every county, municipal corporation, and political subdivision of the state "owning any motor vehicle shall be responsible to every person who sustains any damage by reason of death, or injury to person or property as the result of the negligent operation of any said motor vehicle by any officer, agent, or employee . . . and such person may sue the state . . . municipal corporation. . . . In every case where a recovery is had under the provisions of this section against the state . . . municipal corporation . . . the state, or the . . . municipal corporation . . . shall be subrogated to all the rights of the person injured, against the officer, agent or employee, as the case may be, and may recover from such officer, agent or employee, the total amount of any judgment and costs recovered against the state . . . municipal corporation . . . in such case. . . . " This section was added to the code by chapter 260 of the

Statutes of 1929. Chapter 263 of the same statutes provides that no member of a fire department or police department maintained by a county, city and county, incorporated or unincorporated city "shall be held liable in any civil action for damage to persons or property occasioned by any act of such member arising out of the operation, in line of duty, of a motor vehicle of such department while responding to an alarm of fire or an emergency police call".

By chapter 253 of the Statutes of 1929, section 8½ was added to the California Vehicle Act, defining an "authorized emergency vehicle" as "every vehicle publicly owned and operated by a police or fire department or traffic law enforcement officer in responding to emergency calls or in traffic patrol duty and a vehicle owned and operated by the chief or one assistant chief of an organized fire department in answering fire alarms . . . only when responding to emergency, accident or fire calls". Section 120 of the California Vehicle Act, as amended in 1929, declares that the provisions of that act relating to the speed of vehicles should not apply to "authorized emergency vehicles", but that the provisions of this section should not "relieve the driver of any authorized emergency vehicle . . . from the duty to drive with due regard for the safety of all persons using the highway, nor shall it protect the driver of any such vehicle from the consequence of an arbitrary exercise of the privileges declared in this section". Section 132 of the California Vehicle Act, as amended at the same time, provides that the driver of a vehicle upon a public highway shall yield the right of way to any "authorized emergency vehicle" when the driver thereof sounds audible signal by siren. This section also contains the same provision relative to the duty and responsibility of the drivers of such vehicles which is found in section 120.

The charter of the City of Oakland in conformance with section 6 of article XI of the Constitution reserves to the city all powers given under the Constitution and confers upon the city council power to make and enforce local police, sanitary, and other regulations, to organize, provide, maintain and operate police and fire departments and to regulate the speed with which and the manner in which persons may drive automobiles or other vehicles along any of the streets of the city.

From these various statutory and charter provisions two questions arise in this case. First, do the general statutory regulations governing the operation of vehicles in general upon public highways control the operation of "authorized emergency vehicles" when the latter are operated by a chartered city in the performance of its governmental functions of controlling fires or policing the city? Second, do the general provisions of section 1714½ of the Civil Code imposing liability upon a chartered city for damage arising out of the operation of a motor vehicle in its governmental capacity apply to an "authorized emergency vehicle" which is operated by a chartered city for the purpose heretofore stated?

██ The first question must be answered in the negative because the general provisions of the California Vehicle Act relating to the operation of motor vehicles generally will not be held to have application to an authorized emergency vehicle operated by a municipality for these purposes without an express declaration in the statute of the legislative intention to so apply them. (*Balthasar v. Pacific Electric Co.*, 187 Cal. 302–306 [202 Pac. 37, 19 A. L. R. 452].) Here the legislature by section 8½ of the California Vehicle Act created a special class of vehicles when used for a specified purpose. That is to say, the legislature declared that every vehicle as defined in section 2 of the act when used for the special purposes specified in section 8½ should be treated in a class by itself. If it was not the intent that vehicles used for these purposes should be exempt from the general provisions of the act applicable to "any vehicle" there is no purpose in making the distinction found in section 8½. This position is strengthened by the fact that section 120 of the act expressly exempts "authorized emergency vehicles" from the provisions of the act relating to speed. There are many other traffic regulations and rules of the road too numerous to mention which must be disregarded if these vehicles are to function in the performance of the duties which the law imposes upon the police and fire departments. The case of respondents is not aided by the provisions of section 144 of the California Vehicle Act declaring that the act is applicable to the drivers of all vehicles operated by the state or by any incorporated city subject to such specific exceptions as are set forth in the

act. This section was added in 1923 when no provision was made for an "authorized emergency vehicle" and no provision was made imposing liability upon municipalities for damage arising out of the performance of governmental functions and no exemptions from liability were given the drivers of these emergency vehicles.

If we are in error as to the legislative intention to apply these traffic regulations to the operation of vehicles of this character then the statute to that extent must be held unreasonable and void or at least inapplicable to municipalities while engaged in these governmental functions. In the Balthasar case the Supreme Court, while holding that an exception of such vehicles from the general provisions of the act must be implied, said (p. 308): "It follows that the general rules of the road relating to speed and to the turning of corners contained in the Motor Vehicle Act do not apply to fire or police apparatus. We have only to consider the utter absurdity of requiring peace officers to observe the arbitrary speed limits fixed by the Motor Vehicle Act when pursuing criminals, who may be fleeing in high-power cars at twice the legal limit, to make manifest that the legislature did not have in view such a limitation on peace officers. And it is equally clear that they did not contemplate retarding the speed of fire apparatus in going to a fire." Though the court's judgment was placed on this ground it cited *State* v. *Sheppard,* 64 Minn. 287 [67 N. W. 62, 36 L. R. A. 305], and *City of Kansas City* v. *McDonald,* 60 Kan. 481 [57 Pac. 123, 45 L. R. A. 429], to the point that if an implied exception is not read into the statute then it must be held unreasonable and void for reasons which are aptly stated in the foregoing quotation from the Balthasar opinion. We can find no substantial change in the amendments of 1929 to the California Vehicle Act from those considered by the Supreme Court in that case and we are forced to conclude that the legislative intention as expressed in sections 120 and 132 of the act is that the driver of such a vehicle is not to be controlled by the general traffic regulations relating to the operation of motor vehicles generally, but that he should not be protected from "an arbitrary exercise of the privileges". In the case before us the complaint did not charge and the court did not find that the driver of the vehicle causing

the injury was guilty of an arbitrary exercise of these privileges.

■ Though the point is not argued in full, we are satisfied that if it should be held that the legislature intended these regulations to apply to a vehicle operated under these circumstances and if it should be held that such regulations were not unreasonable as applied to the state and political subdivisions under the control of the legislature then it must be held that such regulations are not applicable to a municipal corporation operating under a freeholders' charter. It has been uniformly held that the organization, maintenance and operation of a police and fire department by a chartered city is a municipal affair and as such not subject to the control of the legislature. In *Ex parte Daniels,* 183 Cal. 636 [192 Pac. 442, 21 A. L. R. 1172], our Supreme Court held that traffic regulations in general were matters of state-wide concern and therefore not subject to local control. In *Balthasar* v. *Pacific Electric R. Co.,* 187 Cal. 302–312 [202 Pac. 37, 19 A. L. R. 452], our Supreme Court, after referring to *Ex parte Daniels, supra,* expressly reserved the question as to the relative authority of the state and city over the control of fire apparatus in the public streets of a chartered city.

■ Upon somewhat similar lines of reasoning we are constrained to hold that section 1714½ of the Civil Code does not confer a right of action against the municipality upon one who has suffered damage by reason of the operation by the municipality of an "authorized emergency vehicle". This section of the code is a departure from a well-settled common-law rule of nonliability for damage arising out of the performance of strictly governmental functions. Such a statute in derogation of a settled rule of law requires a strict construction. Upon the principles of construction heretofore discussed and based upon the rule of the Balthasar case it must be said that the legislature significantly failed to express an intention to include "authorized emergency vehicles" in the section. A cause of action in tort is created against the state and all the public bodies named therein for any damage arising out of the negligent operation of any motor vehicle owned by any such public body or "of any other motor vehicle" by an officer, agent or employee while acting within the scope of his duties. The

effect of the section is to place upon these public bodies a liability for tort whether the damage arises in the performance of governmental or proprietary functions. In thus casting upon these public bodies a liability for damage arising in the performance of purely governmental functions the legislature inextricably linked this obligation with the right of subrogation against the officer, agent or employee whose negligence caused the damage, but though this right of subrogation is an integral part of the section it was immediately taken away from every county, city and district by the enactment of chapter 263 (Stats. 1929, p. 568) which relieved every member of a fire or police department of such public bodies from liability for damage arising out of the operation of an "authorized emergency vehicle". Bearing in mind that the latter act, the amendments to the California Vehicle Act and section 1714½ were all enacted at the same time we must conclude that the legislature did not intend in the enactment of the code section to include damages arising out of the operation of these "authorized emergency vehicles".

█ We are forced to this conclusion for the additional reason that a contrary interpretation of the section would be unreasonable. The organization, operation and control of municipal fire and police departments being a matter of local concern any move on the part of the legislature tending to interfere with or destroy the effective performance of those governmental functions would be contrary to the express limitations of section 6 of article XI of the Constitution except where such matters are of general public or state concern. The control of fires and the policing of the city for the benefit of all its citizens is the primary consideration. In the performance of these functions it is essential that the city have complete supervision and control over its officers and employees. If the legislature had intended by these statutes to create a liability against the city arising out of the performance of these functions, and at the same time relieve its officers and employees from liability, the city's supervision and control over these agents would be seriously handicapped. █ There is a well-settled rule of law that when a master is sued for the negligence of his servant in a case where the master has committed no moral wrong and has not expressly instructed the

particular matter for the doing of which the negligence is charged, a verdict or judgment absolving the employee necessarily exonerates the principal. (*Bradley* v. *Rosenthal,* 154 Cal. 420–423 [97 Pac. 875, 129 Am. St. Rep. 171]; *Triano* v. *F. E. Booth & Co.,* 120 Cal. App. 345–348 [8 Pac. (2d) 174]; *Charles H. Duell, Inc.,* v. *Metro-Goldwyn-Mayer Corp.,* 128 Cal. App. 376–383 [17 Pac. (2d) 781].) This principle seems to have been rested generally on the doctrine of estoppel and in some cases on the doctrine of *res judicata.* We have found no case holding that when the legislature expressly absolves the employee under such circumstances the master may claim exoneration for the act of his servant. On principle it would seem that where there is no moral wrong on the part of the master and no direction as to or knowledge of the manner in which the acts are performed by the servant the equities would demand that when the law expressly absolves the servant from liability for his negligent acts the master, who is without wrong, should not be held accountable for the acts of such servant. It must be assumed that the legislature had these rules of law in mind and that when it expressly excused the acts of those members of a fire or police department operating an "authorized emergency vehicle" it did not intend to place a liability upon the city for damage arising out of those acts. The proper interpretation of section 1714½, as we understand it, is that the public bodies named therein are liable in tort for damage arising out of the negligent operation of any motor vehicle by any officer, agent or employee thereof and against whom the public body named may have the right of subrogation of the person damaged. That in those cases where, because of other statutes controlling, this right of subrogation may not be enjoyed and the negligence of the officer or employee is expressly excused, the provisions of the section do not impose any liability upon the city or other public body named therein.

We have not discussed the question whether the right to sue a chartered city in any case arising from the negligence of its servants is a matter of general state concern or a municipal affair to be governed by the city charter.

We do not discuss the question of excessive damages raised by the appellant because the judgment must be-

reversed for the reasons heretofore stated and this question will not again arise.

The judgment is reversed.

Sturtevant, J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 23, 1933, and the following opinion then rendered thereon:

THE COURT.—In their petition for a rehearing the respondents complain of our failure to emphasize those portions of section 120 of the California Vehicle Act which direct the operator of an authorized emergency vehicle "to drive with due regard for the safety of all persons using the highway . . . " We quoted the section with special emphasis on the latter portion which purported to make such operator liable for "an arbitrary exercise of the privileges . . . ", because that seemed to be the only part of the section which was applicable to the problem under consideration. The duty to drive with due regard for the safety of the public is a duty imposed upon the drivers of all vehicles under the terms of subdivision (a) of section 113 of the act. The seven separate rates per hour specified in subdivision (b) of that section are all "subject to the provisions of subdivision (a) of this section . . . " It has been held time and again that these specifications of speed limits are not the measure of the care with which a vehicle may be operated and are not determinative of the question of negligence, but that in every instance the operator must drive "at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic . . . " (sec. 113). ██ Hence, when the legislature, in section 120, attempted to except authorized emergency vehicles from *all* the provisions of the act relating to speed and then provided that this exception should not include the primary regulation requiring "due regard for the safety" of the public, it added an exception to an exception which completely nullified the latter.

It was for this reason that we concluded that the only reasonable interpretation of the section was that the driver of these vehicles was to be excepted from these provisions

of the act, but that such exception should not protect him "from the consequence of an arbitrary exercise of the privileges declared in this section". If the driver of such vehicle was at all times required to drive with due regard for the safety of the public, as all other drivers are required to do, how could he be charged with an arbitrary exercise of such privileges, and what privileges are granted him by the section? In the Balthasar case, 187 Cal. 302 [202 Pac. 37, 19 A. L. R. 452], the Supreme Court, in construing similar language found in section 132 of the act relating to the right of way, said (p. 311): "It is evident that the right of way of fire apparatus over other vehicles is dependent upon 'due regard to the safety of the public' only in so far as such 'due regard' affects the person required to yield the right of way. Notice to the person required to yield the right of way is essential, and a reasonable opportunity to stop or otherwise yield the right of way necessary in order to charge a person with the obligation fixed by law to give precedence to the fire apparatus."

To our minds the only reasonable interpretation of the act as a whole is that, because of the public necessity for the operation of these vehicles in cases of emergency, the operators are relieved from the general rules of the road applicable to other vehicles but that an arbitrary exercise of these privileges is not excused. In this respect the rules applicable to such vehicles are not unlike the rules under the so-called guest law found in section 141¾ of the same act, and which was added at the same session of the legislature. As a guest is limited in his recovery to proof of "wilful misconduct" it was the apparent intent of the legislature to limit actions for damage caused by these vehicles to cases of an arbitrary exercise of the privileges, which is but another way of saying wilful misconduct.

But, if we are in error in our interpretation of the act, we cannot escape the conclusion that the question is settled by the Balthasar case (187 Cal. 302 [202 Pac. 37, 19 A. L. R. 452]). There the Supreme Court said (p. 308): "It follows that the general rules of the road relating to speed and to the turning of corners contained in the California Vehicle Act do not apply to fire or police apparatus." When that opinion was written the act required the operator of every vehicle to drive with "due regard to the safety of

the public". At the same time section 20 of the 1919 act, which was then effective, contained provisions similar to those now found in section 144 of the California Vehicle Act. Thus when that decision was written there was no express exception of fire apparatus from the regulations covering speed or the other rules of the road. But the court held that such provisions were not applicable to fire apparatus when responding to an alarm. The only substantial change in these provisions of the act since the Balthasar opinion is the use of the expression "authorized emergency vehicle" in place of the longer expressions descriptive of these vehicles. One of the grounds of negligence charged here is the passing to the left of a standing street-car in violation of the provisions of the act. But that is one of the rules of the road which the Supreme Court held was not applicable to such vehicles. There has been no change in the statute in this respect and we must take that decision as determinative.

Finally it should be said that the Supreme Court did not in the latter case "approve" the instructions upon which respondents are here relying. The court merely said that those instructions "are quite as favorable as the defendant was entitled to". If a verdict had gone for the defendant in that case we have no doubt that the court would have been compelled to hold that these instructions were prejudicial to the plaintiff.

The petition for a rehearing is denied.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 22, 1934.

Curtis, J., and Preston, J., dissented.