[Civ. No. 5122. Third Appellate District.—April 17, 1935.]

DOMINIC FALASCO et al., Plaintiffs and Respondents, v. LEWIS HULEN, Appellant; FRANK DAMBROSIO et al., Cross-Defendants and Respondents.

F. M. Ostrander for Appellant.

H. K. Landram and D. Oliver Germino for Respondents.

PLUMMER, J.—The plaintiffs, Dominic Falasco and Mrs. Dominic Falasco, had judgment against the defendant for and on account of injuries alleged to have been suffered at the hands of the defendant by reason of his negligent management of an automobile on the thirteenth day of March, 1932. No judgment was entered in favor of the other plaintiffs named in the action. From the judgment in favor of Dominic Falasco and Mrs. Dominic Falasco, the defendant appeals.

The defendant, Hulen, filed a cross-complaint against Dominic Falasco and Frank Dambrosio et al. Judgment went against defendant Hulen, upon his cross-complaint, and from this judgment, Hulen also appeals.

Upon this appeal the appellant urges six grounds for reversal, to wit:

1. That one person conveying an injured person to an hospital under convoy of a state traffic patrolman, is not bound to obey the speed laws and traffic regulations of the California Vehicle Act;

2. That the court erred in instructing the jury;

3. That a constable using his own automobile, is exempt, under the act of the legislature No. 2602 Deering's General Laws, from negligence while conveying an injured person to an hospital;

4. That plaintiffs were guilty of contributory negligence as a matter of law;

5. That the evidence was insufficient to warrant holding the appellant negligent;

6. That the court erred in failing to admit evidence of the alleged customary and usual duties of constables.

On the thirteenth day of March, 1932, the Merced County Farm Bureau held a picnic at a ranch about twelve miles west of the city of Los Banos on the Pacheco Pass highway. On the afternoon of that day, at the picnic grounds, a small girl by the name of Elsie Rocha was injured. It appears that a contest of throwing a rolling-pin was in progress, when a woman throwing one of the pins misdirected the same, and in the course of its flight the rolling-pin struck the Rocha girl on the head, causing considerable effusion of blood. The defendant took the girl in his automobile and started to convey her to an hospital in Los Banos. Preceding him was a traffic officer named Nicholson on a motorcycle. The course followed by Nicholson on his motorcycle, and Hulen in his automobile, was easterly over the Pacheco Pass highway. At about the same time the plaintiff, Dominic Falasco, having with him his wife and children, was driving an automobile westward on the same highway. The Pacheco Pass highway from Los Banos westward to the picnic grounds is over a number of low rolling hills. The scene of the accident considered herein took place about midway between Los Banos and the picnic grounds, and was between two of the hills crossed by the Pacheco Pass highway.

After leaving the ranch, Officer Nicholson preceded the Hulen automobile, acting as a convoy, and set the speed of his motorcycle at 65 miles per hour. The defendant followed in his automobile, having with him a young man who was carrying in his arms the Rocha girl. As Nicholson proceeded eastward, he kept the siren on his motorcycle sounding, and the plaintiff and others near the scene of the accident, hearing the siren of the motorcycle moved, apparently as expeditiously as possible, to the right-hand side of the paved portion of the highway, which at the place in question is testified as having a width of 18 feet with two feet shoulders on each side. In proceeding eastward the record shows that Officer Nicholson gained somewhat on the automobile driven by Hulen, until he was some 800 feet ahead of the defendant. The testimony as to the distance between the motorcycle and the automobile

varies somewhat, some of the witnesses placing the distance at 600 feet, others at 1200 feet. There is sufficient showing in the testimony to justify the jury in concluding that the distance between the motorcycle and the automobile near the scene of the accident was at least 800 feet. The hill on the side on which the accident occurred has an elevation above the main level of the highway of about 35 feet. One driving eastward on that hill is confronted with what was called in the testimony, a "blind spot", but which we will call an area of several feet in length, where it was impossible to observe the approach of motor vehicles on the opposite side.

At the bottom of the hill on which the accident occurred is a culvert. On approaching this culvert Dominic Falasco heard the siren being sounded on the motorcycle, being too close to the culvert to stop, drove his automobile as closely to the right-hand side as possible, and after the officer had passed by, continued on up the hill at a medium speed, driving over to the right side of the highway until, at the time of the collision, the testimony shows without contradiction that the front portion of his automobile was not only off the highway, but also that it was off the shoulder on the right-hand side. A number of the witnesses testified that his automobile was entirely to the right of the shoulder, one witness testifying that the left rear wheel of the automobile driven by Dominic Falasco, he thought was on the shoulder. After Officer Nicholson had passed, there appeared nothing in sight which necessitated the plaintiff, Dominic Falasco, stopping his automobile, but it appears that he nevertheless drove up the hill, keeping to the right, as we have stated. About the same time an automobile driven by the defendant, Frank Dambrosio, was being operated on the Pacheco Pass highway, moving in an easterly direction, and was sufficiently over the crest of the hill, which we are about to mention, as to be out of sight of an automobile coming up the hill from the opposite side.

There are three automobiles specifically involved in the testimony. A Packard, driven by the plaintiff, Dominic Falasco, a Ford, driven by Dambrosio, and a Pontiac coupe, driven by the defendant Hulen.

Just after the Ford car had passed over the crest of the hill, and while the Packard was moving at a moderate speed uphill (both cars being kept to the right of the paved portion of the highway, or practically so), the defendant Hulen, driving his car at a speed of between 60 and 65 miles per hour, came over the crest of the hill in sight of the Ford and the Packard cars. The defendant himself testified that he was driving between 60 and 65 miles an hour. Officer Nicholson testified that he set the pace at 65 miles per hour. Just as the Pontiac coupe had negotiated the crest of the hill, the defendant observed the Ford car, and thinking that it was pulling back toward the paved portion of the highway, steered his car to the left, applied the brakes, and by some means caused his car to skid and go diagonally across the highway directly toward the Packard car, coming into collision with the Packard at the front portion thereof, which was not only off the paved portion of the highway, but also off the 2 foot shoulder along the right-hand side thereof, causing the injuries to the plaintiffs for which damages were awarded.

The defendant Hulen, testified that he was sounding the siren on his car; on the other hand witnesses who were near the scene of the accident, to wit, Dr. Covell, Mrs. Covell, Frank Dambrosio, Dominic Falasco, and a witness by the name of Arbura, testified to hearing the siren sounded by the Officer Nicholson, while Dr. Covell, Mrs. Covell, Dominic Falasco and the witness Dambrosio all testified there was no siren being sounded on the Hulen car. Dr. Covell, a witness to the accident, described it as follows: "We heard a siren faintly. We immediately decelerated. I looked back; noticed the Packard; could see no one, so I dismissed the possibility of the siren being behind us. At that moment, I should say just before I reached the bottom of the draw, between the two hills, an officer appeared at the brow of the oncoming hill; he was on a motorcycle; he had his lights on, and his siren was going. I maintained my speed at about the same it had been placed when I heard the siren. We were maintaining our position well over to the righthand side, wondering why the siren was on, and what the officer was doing, because he appeared to be attached to nothing. As we approached the bottom of the draw shortly after, al-

most immediately after the officer appeared in sight, a small car came over the brow of the hill, running quickly onto the dirt and throwing up an immense cloud of dust. Just as we reached the brow of the hill we came quickly in sight of a red coupe. Simultaneously with our seeing him he put on his brakes, and immediately his car skidded toward me, the left rear end coming toward my car. I cut for the ditch, and exclaimed to Mrs. Covell, 'My God, he is going to hit that Packard.' I turned to my right and looked through the rear window and saw the red car hit the Packard. At the time of the impact the Packard was pointed diagonally off the highway; I should say it was north, as if attempting to avoid the collision. At the moment of impact I should say the left rear wheel, if any, of the Packard was on the highway. I am not positive as to that."

A portion of the defendant's testimony may here be quoted, to wit: "Well, as I came up over the hill I observed a car pulling out on the highway ahead of me. In fact, he was just pulling out on the highway. He hadn't got straightened out yet, and I put on my brakes. . . . Just about the time I pulled off I observed Mr. Falasco coming up the highway on the opposite side, and went down the hill and collided. After I turned to the left I did not turn again to the right. I turned my car to the left and continued then in a diagonal direction at all times up to the time of the accident. I traveled probably 200 feet, perhaps more. . . . As I came up from the west side of the hill on which the accident occurred, toward the top, I was traveling between 60 and 65 miles per hour. . . . I was driving a red Pontiac sport coupe."

Dominic Falasco testified at the time of the collision the front end of his car was 5 or 6 feet off the pavement; that the Pontiac struck on the left fender, hood, and left wheel; that at the time, the Packard was moving at a speed of from 5 to 10 miles an hour, almost at a stop.

The testimony further shows that at no time was the Falasco car being driven at an excessive speed, and as we have stated, all of the witnesses save one testified that Falasco's car was entirely off the highway; and the testimony is all substantially to the effect that the Ford car was off the highway, the defendant being the only one

testifying that the Ford was coming back on the paved portion of the highway.

Irrespective of whether the Ford car was entirely off the paved portion of the highway, or was coming back onto the highway, the testimony shows that the Packard and the Ford cars, as testified to by the defendant, were 200 feet or more apart, and as the testimony all shows that the Packard was practically off the paved portion of the highway, the paved portion of the highway being 18 feet in width, there was ample room for the defendant, if he had had control of his car, to pass between the Ford car and the Packard car without colliding with either one of them.

A number of witnesses testified to what we have set forth herein, but there is substantially no conflict concerning the facts, and what we have stated shows the situation and the circumstances which the jury had before it to consider. The defendant was driving at between 60 and 65 miles per hour over rolling hills and over a hill that made it impossible for him to see sufficiently far ahead to observe an obstruction in time to bring his car under control. He was at least 800 feet in the rear of the motorcycle being driven by Officer Nicholson; he failed to pass between two cars, where the testimony shows that they were in such a position as to afford ample room for safely doing so; that the defendant was driving at such an excessive speed that when he applied his brakes the car skidded and he went diagonally at least 200 feet toward the Packard car without attempting to turn his car to the right, and came in collision therewith. There is some testimony to the effect that the Packard and the Ford cars were between 250 and 300 feet apart, but accepting the testimony of the defendant, we think the jury was warranted in concluding that there was ample room to drive between two cars; in fact, the testimony showing that the Ford car was practically on the south side of the paved portion of the highway, and the Packard was off the paved portion of the highway on the north side, save possibly as to the rear wheel, and the paved portion of the highway being 18 feet in width, had the Ford and the Packard car been exactly opposite each other, the figures show ample space to pass between the two without colliding with either, if the defendant had had control of his Pontiac car.

Placing the Ford car in the position testified to by the defendant, the left-hand side of the highway affording ample width for passage is nevertheless shown to have been unobstructed. Police Officer Nicholson testified as follows: "As I came over the brow of the hill going toward Los Banos, I had my siren open and was traveling approximately 65 miles an hour. I saw Dambrosio's car pulling off on the righthand side just below the brow. He pulled clear off to the righthand side. I remember seeing Falasco's car and Mr. Arbura's car. I don't recall seeing Dr. Covell's car. When I passed Dambrosio's car it was clear off the highway. When I passed the Falasco car he was just this side of the culvert, that is, west of the culvert. Mr. Falasco was over on his righthand side but not clear off the highway. The right portion of his car was off the highway, but the left side of his car was on the paved portion. Arbura's car was parked on the righthand side of the road. I didn't look around until I started up the other hill. I just happened to glance around back and I saw there had been an accident. The last time I saw Hulen's car it was about 450 feet behind me. Mr. Hulen must have been making the same speed as I was if he was keeping right up pretty close to me. I held my speed around 65 miles all the time. When I got to the scene of the accident the Falasco car was pointed out toward the fence. The whole front portion of the Falasco car was away off the pavement. I observed tire marks on the pavement, like a tire skidding, a black mark on the highway. The mark went right to the ends of the highway, and went back about 175 feet, angling to the righthand side of the highway toward Pacheco Pass. My purpose of coming in and leading Mr. Hulen with my siren open was in order to permit him to convey this girl (Elsie Rocha) to the hospital as quickly as possible. I imagine I was 800 feet from the accident."

In addition to what we have stated, the defendant Hulen testified that he was the constable of township No. 3, Merced County; that he was traveling toward Los Banos, and as he came over the top of the hill was traveling between 60 and 65 miles an hour. As he came over the hill he saw the Ford car ahead of him and pulled off to the left. "I observed Mr. Falasco coming up the highway on the oppo-

site side and went down the hill and collided. I would say I was about 30 feet back from the top of the hill when I observed the car pulling off (onto) the pavement in front of me. This car that pulled in front of me was a small car. When I observed the car in that position I put on my brakes and pulled out to go by him. I observed the Falasco car at about the same time; that is, about the time that I put on my brakes, and when I observed the Falasco car it was coming up the hill; I guess it was about half-way up the hill; he was well over on the righthand side. My best recollection is that the Falasco car was not off the pavement. The Falasco car continued right up the highway; I did not observe him turn further to the right. My car went across the highway. After I turned to the left I did not turn again to the right, but held my car in that diagonal direction up until the time of the accident. I would say I traveled approximately 200 feet after I applied my brakes. When I struck the Falasco car the rear end was on the pavement, that is, the left rear wheel was on the pavement, and the front wheels were off the pavement. My brakes were in good condition. I don't know how far it would take me to stop under the conditions there. I did not use my emergency brake at that time; I just used my foot brake. I had my brakes adjusted about two weeks before the time of the accident. I would say that the car on the right side of the pavement that I tried to turn out for when I first saw it, was 150 feet away. I would say that the Ford car and the Falasco car were probably 250 feet apart." The appellant's brief as to this particular reads: "The Ford car and the Falasco car were probably 250 feet away." The testimony in the transcript is as follows: "Q. How far apart was the Ford car and the Falasco car? A. Well, they were probably 250 feet." Hulen testified further, that he would judge the Falasco car was traveling between 30 and 35 miles per hour. As to the injury to Elsie Rocha, and his starting with her to the hospital, Hulen testified as follows: "Charlie Machado brought the little girl, carrying her. Someone said, 'Will you take her to the hospital?' I went back after my car. When I got back Nicholson was there and he said, 'You follow me and I will clear the highway for you'. From the appearance of the Rocha girl at

that time I thought she was dying. I followed Nicholson onto the highway. My car is equipped with a siren, and I blew the siren right after I started, and continued to blow it until just before the accident. Nicholson's siren was much louder than mine. The siren was worked with my left foot. Just before the accident I swerved to the left because it looked like I could not miss Falasco on the left side, so I thought I could get into the bank and hit the ditch. I was injured in the accident; my left leg was broken; two ribs broken on the side; had two cuts on the hand, a cut on the leg, and was in the hospital 97 days.''

Dambrosio testified that when he heard the siren on the motorcycle, he pulled entirely off the highway, and kept off. This witness testified he did not see the accident; that he was looking at Nicholson all the time; that he was about halfway down the hill when he first heard the siren; that he started to pass Falasco's car about the center of the hill; Nicholson and Falasco passed just about the same time, just after he heard the siren. This witness further testified: ''I heard the siren and I pulled off and slowed down before I stopped; I slowed down to 10 or 15 miles an hour, and at that time was about three-quarters of the way up the hill. The Falasco car was up aways from the culvert, I would say about 100 feet. After Nicholson passed me I continued to drive to my right until I got completely off the pavement and the oiled road, and stopped.'' There is testimony in the record of other witnesses to the effect that they heard the siren on Hulen's car.

While there is some conflict in the record as to the respective distances of the cars from the brow of the hill, and also from the culvert at the base of the hill, likewise, as to the distance apart of the various cars, these distances are shown, however, to have been mere estimates and not actual measured distances, it does appear without any conflict that at the time Hulen's car came over the brow of the hill, the motorcycle on which Officer Nicholson was riding was at the bottom of the hill some 800 feet away, and Dambrosio's car and the car driven by Falasco were either entirely off the paved portion of the highway on what would be the respective right side for each car, or so nearly so as to leave, as we have stated, an unobstructed passage. After the passage of Nicholson's motorcycle, for a few seconds of time there

appeared no reason why other automobile drivers might not resume their respective places on the highway had they so elected. The distance between the motorcycle and the Pontiac car driven by Hulen had become so great owing to the contour of the highway that the convoy purposes of Nicholson could not readily be seen or perceived.

■ In support of his contention that the appellant being a duly elected constable of township No. 3, Merced County, was not bound by the speed laws or traffic regulations of the California Vehicle Act, the appellant calls our attention, first, to section 29 of the California Vehicle Act, which specifies in subdivision ''B'' thereof that the duties of highway patrol officers are to direct traffic in conformance with the provisions of the act, provided, that in the event of a fire or other emergency, or to expedite traffic, or to insure safety, officers of the highway patrol may direct traffic as conditions may require. There is nothing in this section, however, which authorizes a mere private individual to drive at the rate of 60 or 65 miles an hour under conditions when he cannot see the highway in front of him for a sufficient distance to bring his car under control to avoid collisions with other cars, or other persons rightfully on the highway. ■ Nor does it appear that Officer Nicholson was in fact directing traffic. If it be admitted that he was acting as a convoy or escort to the car being driven by the defendant, then subdivision ''B'' of section 95 of the act would appear to be applicable, where it is declared to be ''unlawful for any police or traffic law enforcement officer to use a siren, or to travel at a speed in excess of that permitted under section 113, when serving as an escort of any procession or of any other vehicle traveling upon the public highway''.

■ It is true that section 120 of the California Vehicle Act provides as follows: ''The provisions of this Act regulating the speed of vehicles shall not apply to authorized emergency vehicles as defined in this Act, when such vehicles are being operated in the chase or apprehension of violators of the law, or of persons charged with, or suspected of any such violation, nor when traveling in response to a fire alarm, nor to the vehicles of licensed physicians when traveling in response to emergency calls.'' The section, however, does not relieve from liability from any arbitrary exercise

of the privileges therein granted. Section 8½ of the act reads: "Every vehicle, publicly owned and operated by police or fire department or traffic law enforcement officer in responding to emergency calls, or in traffic patrol duty," etc., is an emergency vehicle. The section further provides that vehicles responding to emergency calls by a state or county forest ranger, in case of fire, also, any fighting equipment; likewise any publicly owned ambulance or privately owned ambulance used in responding to emergency calls; and likewise, emergency repair vehicles, are not limited by the speed regulations of the act. A mere reading of the section shows that the automobile driven by Hulen does not come within the qualifications of an authorized emergency act. The mere fact that he was a constable in township No. 3 of Merced County, does not make his automobile an emergency vehicle.

■ Some contention is made that Dominic Falasco did not comply with section 133 of the California Vehicle Act, which reads: "Upon the approach of any authorized emergency vehicle, giving audible signal by siren, the driver of every other vehicle shall immediately drive the same to a position as near as possible and parallel to the right-hand edge or curb of the highway, clear of any intersection, and shall stop and remain in such position unless otherwise directed by a police or traffic officer, until the authorized emergency vehicle shall have passed."

The facts show that the failure, if it be a failure, of Dominic Falasco to get entirely off the highway before Officer Nicholson passed, did not contribute to the collision, or did not interfere with the safe passage of Officer Nicholson.

Again, a question was presented to the jury as to whether Hulen's car coming up from the opposite side of the hill, was giving an audible signal by a siren, even if it be conceded that the car driven by him, for the time-being should be classed as an emergency vehicle.

■ The appellant likewise relies upon the act of the legislature approved May 11, 1929 (Stats. 1929, p. 568, Act No. 2602, of Deering's Gen. Laws), which reads: "No member of a fire department or police department maintained by a county, city and county, incorporated or unincorporated city, town or district, shall be held liable in any

civil action for damage to person or property occasioned by any act of such member, arising out of the operation in line of duty, or of a motor vehicle of such department while responding to an alarm of fire or an emergency police call." The defendant was not, and is not an employee of any fire or police department; nor an employee of any county. This act, by its very terms, is confined to police and fire departments. The title makes no mention of county or township officers or elective officers of any kind. It applies only to employees. The fact that a constable is a peace officer does not bring him within the terms of the act relieving fire department employees and employees of the police department from liability.

Section 24 of article IV of the Constitution limits the scope of an act to the subjects mentioned in its title, and no mention of township or county officers being made, the construction contended for by the appellant would of course be in violation of the Constitution. ■ Hulen was not responding to a police call, nor was he responding to any other of the acts which would relieve a member of the police department or fire department from liability. The fact that he was, as we may say, on a mission of mercy in endeavoring to take the injured girl to an hospital as quickly as possible, did not relieve him from exercising reasonable care in avoiding injury to others who might be on the highway.

■ The excerpts which we have taken from the testimony and set forth herein we think, beyond controversy, authorized the jury in concluding that neither Dominic Falasco nor Frank Dambrosio were guilty of any negligence, whether as a matter of law or as a matter of fact. The facts as set forth almost establish beyond a reasonable doubt that no act of either Dominic Falasco or of Frank Dambrosio contributed in any particular to the collision. ■ The ruling of the court in excluding a question as to whether it was customary or usual for constables to convey injured persons to hospitals, was clearly correct. That they perform such duties does not thereby relieve such officers from the restrictive provisions of the California Vehicle Act. Nor was it material as to what the defendant Hulen may have thought as to the serious condition in which he found the injured child. While, as we have stated, the injury caused

a great effusion of blood, and while somewhat severe, it was not what would ordinarily be termed a serious injury. Of this, it is probable the defendant Hulen was unaware.

We think the following excerpt taken from the case of *Vandell* v. *Sanders*, 85 N. H. 143 [155 Atl. 193, 80 A. L. R. 550], cited by the appellant, is a conclusive answer to his contentions, even though his car for the time-being be classed as an emergency vehicle, to wit: ''The speed limitations set forth herein shall not apply to vehicles when operated with due regard for safety under direction of the police in the chase or apprehension of violators of the law, or of persons charged with, or suspected of any such violation; nor to fire department or fire patrol vehicles when traveling in response to a fire alarm; nor to public or private ambulances when traveling in emergencies. This exemption shall not, however, protect the driver of any such vehicles from the consequences of a reckless disregard of the safety of others.''

█ If driving over the brow of a hill where one's view is obstructed, where one cannot see what is on the opposite side of the hill for a sufficient distance to control the speed of his car, and going over a hill at the rate of between 60 and 65 miles per hour is not act showing a reckless disregard of the safety of others, it is difficult to conceive what would amount to such an act. Here, the car was going over the hill at such a rate of speed that when he applied the brakes it skidded diagonally across the highway for a distance of approximately 200 feet and collided with a car which was either entirely off the paved portion of the highway or only had the rear left wheel thereon. The witness' own testimony is to the effect that he made no effort to turn his car to the right. We think the facts set forth herein show the jury was entitled to come to one of three of the following conclusions: 1. That the defendant was driving at such a reckless rate of speed that he could not control his car; 2. That he was driving at such a high rate of speed that he did not perceive that the highway ahead of him afforded an unobstructed passage; 3. That the defendant, under the circumstances shown by the foregoing testimony, was driving at a rate of speed violative of, and absolutely in disregard of subdivision ''A'' of section 113 of the California Vehicle

Act, which provides that no person shall drive any vehicle upon a public highway at such a rate of speed as to endanger the life, limb or property· of any person. ▮ Driving of an automobile where the rising ground bars the view so that the driver can neither see, nor his oncoming automobile be seen, we think imposes upon one the same care required of a driver whose eyes are blinded by glaring lights or the dazzling rays of a setting sun. Under such conditions failure to slow down and bring one's automobile under control is held negligence. (*Hatzakorzian* v. *Rucker-Fuller Desk Co.*, 197 Cal. 82 [239 Pac. 709, 41 A. L. R. 1027] ; *Havens* v. *Loebel,* 103 Cal. App. 209 [284 Pac. 676] ; *Meads* v. *Deener,* 128 Cal. App. 328 [17 Pac. (2d) 108].) In such instances the hazard is the same, necessitating the same reasonable care and caution.

▮ Section 120 of the California Vehicle Act does not relieve the drivers of emergency vehicles from the duty of driving with due regard for the safety of all persons using the highway, nor does it protect the driver in the exercise of any arbitrary privileges. The same restrictive provisions appear in section 132, *supra*. ▮ The record before us amply justified the jury in coming to the conclusion that both Dominic Falasco and Frank Dambrosio complied with all of the legal requirements of section 133, *supra*. No intersection is involved in this action.

The appellant calls our attention to, and quotes at length from a number of cases having to do with fire equipment and police departments when attempting to apprehend fleeing criminals, to wit: *Balthasar* v. *Pacific Elec. Ry. Co.*, 187 Cal. 302 [202 Pac. 37, 19 A. L. R. 452] ; *Armas* v. *City of Oakland,* 135 Cal. App. 411 [27 Pac. (2d) 666, 28 Pac. (2d) 422] ; *Tuten* v. *Town of Emeryville,* 139 Cal. App. 745 [35 Pac. (2d) 195] ; and similar cases from other jurisdictions. The circumstances of these cases are all readily distinguishable from those presented in the case at bar. In all of the cases either a fire equipment was speeding to extinguish a blaze, or a police officer was hastening to apprehend some fleeing criminal. The safety of society under such circumstances demands exemption from liability. That exemption, however, does not extend to any arbitrary action. It is readily perceived that when an officer is seeking to overtake a speeding offender, a requirement to stop at ar-

terials or lessen his own speed would be, in effect, giving the offender a handicap as against the officer seeking to make his arrest.

In the case we are considering nothing of the kind is presented which the courts had to consider in the cases relied upon by the appellant. In some of the cases relied upon by the appellant section 1714½ of the Code of Civil Procedure was involved, which is not the case before us. Relying upon that section and its failure to include chartered cities, exemption from liability was sustained.

In contradistinction to the cases relied upon by the appellant we think that the case of *Spencer* v. *Schiffman* (also entitled *"Delgado* v. *Schiffman"*), 119 Cal. App. 746 [7 Pac. (2d) 361, 364], sets forth a rule applicable here. In that case two police officers riding on motorcycles in response to an alleged emergency call, which was in fact a call to investigate an accident, were traveling at the rate of 37 miles per hour. On reaching an intersection the rate was reduced to 25 miles an hour, at which speed a collision occurred with an automobile. The plaintiffs were injured. The court held that the police officers were negligent and that they were not protected by any provision of the California Vehicle Act, and damages were denied. In concluding its opinion in that case the court said: "Moreover, by express provision of Section 132 of the Statute (California Vehicle Act, Stats. 1923, pages 517–560), the driver of any emergency is not relieved from the duty to drive with due regard to the safety of all persons using the highway, nor from the consequences of the arbitrary exercise of the privileges theretofore declared in the Statute."

 Public officers, which includes of course, sheriffs and constables, are not relieved from liability for acts of negligence. (*Perkins* v. *Blauth,* 163 Cal. 782 [127 Pac. 50], dealing with officers of reclamation districts; *Proper* v. *Sutter Drainage District,* 53 Cal. App. 576 [200 Pac. 664], dealing with the same class of officers; *Filarski* v. *Covey,* 75 Cal. App. 353 [242 Pac. 874], dealing with sheriffs and deputy sheriffs; *Wolfsen* v. *Wheeler,* 130 Cal. App. 475 [19 Pac. (2d) 1004]), dealing with officers whose duties were to exterminate rodents and other pests; notes in 1 A. L. R. beginning on page 236, treating of duties of sheriffs and

deputy sheriffs; *Manwaring* v. *Geisler*, 191 Ky. 532 [230 S. W. 918, 18 A. L. R. 192]. We quote from the syllabus: "A police officer is not exonerated from liability for injuries inflicted on another while in the discharge of official duties, on the ground of public necessity, if he failed to exercise reasonable care for the protection of those whom he knew, or by the exercise of reasonable judgment should have expected to be at the place of the injury." See, also, notes to the same case, beginning on page 197, under the caption, "A peace officer is generally held to be personally liable for negligent or wrongful acts causing personal injury or death". To the same effect is the case of *Florio* v. *Mayor and Alderman of Jersey City*, 101 N. J. L. 535 [129 Atl. 470, 40 A. L. R. 1353, and notes beginning on page 1358].

██ Without quoting the instructions requested by the appellant and refused by the trial court, it is sufficient to say that the court did not commit any error in those particulars. The failure of Falasco or of Dambrosio to have their cars standing still when Officer Nicholson passed by did not in anywise contribute to the collision which subsequently occurred. Not being a part thereof, or contributing thereto, any negligence in failure so to stop is wholly immaterial.

██ Nor did the defendant Hulen have the right to assume that no other person would be upon the highway, nor was the court under obligations to include in an instruction a semi-argument by setting forth all the circumstances upon which the appellant relied, which circumstances we have shown afforded no exemption as against reckless speeding.

██ Among the instructions given by the trial court we find instruction No. 10, which included all of the provisions of section 113 of the California Vehicle Act, save and except subdivision "C". Following this instruction the court read to the jury instruction No. D–7 as follows:

"The law of this state provides that any person driving a vehicle on the public highways of this state shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway, and no person shall drive a vehicle upon a public highway at such a speed as to endanger the life, limb, or property of any person.

*"Subject to the provisions of the law just read to you, it is unlawful for a person to drive an automobile in excess of 45 miles per hour.*

"Should you find from the evidence in this case that the defendant Hulen violated either of said provisions of law, then you may find that he was guilty of negligence, and if such negligence, if any, on the part of said Hulen, proximately contributed in the slightest degree to the incident in question, and his resulting injuries, if any, he is not entitled on recover on his cross-complaint and your verdict should be for the cross-defendants Frank Dambrosio and Dominic Falasco."

The following words, to wit,—"Subject to the provisions of the law just read to you, it is unlawful for a person to drive an automobile in excess of 45 miles per hour",—contained in instruction No. D–7, do not correctly state the law when applied to civil cases. This instruction was directed to the alleged negligence of Dominic Falasco and Frank Dambrosio set forth in Hulen's cross-complaint. While it may be unlawful, which we do not decide, to drive an automobile in excess of 45 miles per hour, such driving in and of itself is no longer held to be negligence. (*Pilcher* v. *Tanner Motor Livery,* 138 Cal. App. 558 [33 Pac. (2d) 58]; *Nieves* v. *Vigolino,* 135 Cal. App. 763 [27 Pac. (2d) 916]; *Schroeder* v. *McCargar,* 137 Cal. App. 320 [30 Pac. (2d) 543].) The error in this instruction, however, does not necessitate a reversal. It was directed primarily to the cross-complaint filed by the defendant Hulen, in which he was seeking damages. The testimony in relation thereto showing beyond controversy that he was not entitled to recover any damages as against either Falasco or Dambrosio renders the instruction harmless. Likewise, the testimony which we have set forth showing, as we think beyond question, negligence on the part of the defendant Hulen, under the provisions of section 4½ of article VI of the Constitution, we are required to hold the erroneous instruction did not and could not result in a miscarriage of justice. We have considered all of the instructions given and refused, and deem further comment thereon unnecessary.

The judgments are affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 13, 1935.