## JOHN B. WARD *v.* THOMAS W. MULFORD *et als.*

32    365
85    466
85    483
32    365
:118   184

RIGHT TO LAND ACQUIRED FROM MEXICO OR SPAIN.—The transfer of the sovereignty of California from Mexico to the United States did not affect the right of the inhabitants to their land which they had acquired from Mexico or Spain, before such transfer.

TITLES ACQUIRED FROM MEXICO IN CALIFORNIA.—The United States, after the acquisition of California from Mexico, was bound to respect, not only perfect titles acquired by the inhabitants under Mexican domination, but also to respect such equitable claims as had their origin in the action of the Mexican Government, but were inchoate at the date of the succession, and to take such steps as were necessary to perfect the same.

JUDGMENTS AFFIRMING VALIDITY OF MEXICAN GRANTS.—The judgment of the Board of Commissioners appointed by the United States to inquire into the validity of titles acquired from Mexico, or of the Courts of the United States on appeal,

affirming a title derived from Mexico, when final, is conclusive upon the Government and upon all persons claiming under the Government by title subsequent.

RIGHT OF CALIFORNIA TO LAND WITHIN ITS BORDERS.—The State of California came into the Union, with her claim to the lands within her borders, such as she took by virtue of her admission under general grants to all the States previously made by the Federal Government, and such as might thereafter be granted from the same source, and such as she then acquired by virtue of her sovereignty, subordinate to the prior equities of grantees under the former sovereign, and bound by the action of the Federal Government in ascertaining and settling such equities.

MEXICAN GRANT OF LAND OVERFLOWED BY TIDES.—If the United States has confirmed the title to land in this State acquired from Mexico during Mexican rule, and which the State would otherwise have owned by virtue of its sovereignty, the State has no power to dispose of the same.

LAND HELD BY STATE BY SOVEREIGNTY.—The land which the State owns by virtue of its sovereignty is such as is covered and uncovered by the ebb and flow of the neap or ordinary tides.

SALE OF LAND HELD BY STATE BY ITS SOVEREIGNTY.—The State can make no disposition of the lands it holds by virtue of its sovereignty prejudicial to the rights of the public to use them for navigation and fishery, but it may dispose of such lands for the purpose of promoting the interests of navigation or of reclaiming them from the sea, where it can be done without prejudice to the public right of navigation.

APPEAL from the District Court, Third Judicial District, Alameda County.

The defendants appealed.

The other facts are stated in the opinion of the Court.

*E. W. F. Sloan*, for Appellant.

The land in controversy is included by the official survey as part of the San Leandro Rancho, and if the views advanced in *Teschemacher* v. *Thompson* are in all respects to be maintained, the judgment herein rendered by the Court below should be affirmed. It is obvious, however, that one great cardinal principle of law was overlooked in the decision of that case, which decision, in one important particular at least, is in direct conflict with those made by the Supreme Court of the United States, in *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Goodtitle* v. *Kibbe*, 9 How. 471; and *Seabury* v. *Field*, 19 How. 333.

The record in this case shows, that by the express language of the original grant the San Leandro Rancho is bounded on

the west by the sea; that is to say, by the line of high tide. It is therefore undeniably certain that the land in question lies without the exterior boundaries of said rancho, and was consequently not granted by the Mexican Government. All that has been said and all that can be said on behalf of the respondent is, that it has been included by the survey and has *thereby* become part of the rancho. The claim has been confirmed and surveyed, and a patent has been issued releasing all the right of the United States to the land within the survey. It is therefore conceded that the final decree of confirmation was, upon acknowledged principles of law, binding upon the United States. It is also conceded that, as against the United States, the patent vested in the confirmees a good legal title to the entire tract of land therein described. But it is perfectly clear that, as against any one else, whose claim of right accrued prior to the 3d of March, 1851, the decree is not conclusive. It is a most obvious principle of natural justice and of law, that no one shall be bound by proceedings to which he is not a party. (1 Greenl. Ev., Sec. 522.) "Under the term parties, in this connection, the law includes all who are directly interested in the subject matter, and had a right to make defence or to control the proceedings, and to appeal from the judgment. The right involves also the right to adduce testimony and to cross examine the witness adduced on the other side. Persons not having these rights are regarded as strangers to the cause." (Id., Sec. 523 ; *Vose* v. *Morton*, 4 Cushing, 31 ; *Pond* v. *Makepeace*, 2 Metc. 114 ; *Leonard* v. *Bryant*, 11 Metc. 370 ; *Carter* v. *Bennett*, 4 Florida, 352 ; *Watson* v. *Spence*, 20 Wend. 262.) But in proceedings before the Board of Land Commissioners and before the District and Supreme Courts, neither the State of California nor any one claiming under it had the right to intervene. That privilege was not given by the Act of Congress of March 3, 1851, nor by any subsequent act. It is therefore evident that the State of California is not concluded by the decree of the District Court confirming the survey. So far as the right of the State is concerned the whole pro-

ceeding was *coram non judice.* It is admitted that if any particular parcel of tide land had been previously granted to some private individual by competent authority it would form no part of the domain of the State. But whether such grant were in fact ever made is a question to be judicially tried and determined; and in the trial and decision of it the State or her patentee is entitled to be heard.

*W. W. Crane, Jr.,* for Respondent.

The case of *Teschemacher* v. *Thompson,* 18 Cal. 11, is precisely parallel with the case at bar. I in part prepared a brief upon the questions involved, but finding that all the reasoning fell naturally into the same lines as in that case, and being unable to add anything to the able argument of Judge Field, I will re-submit that case as embodying all that can be said by respondent, and will only in addition refer to the cases subsequently decided by this Court upon the proposition as to who constitute "third persons" within the meaning of the fifteenth section of the Act of Congress of 1851, to ascertain and settle private land claims in the State of California. (*Leese* v. *Clark,* 20 Cal. 425; *Minturn* v. *Brower,* 24 Cal. 644; *De Arguello* v. *Greer,* 26 Cal. 626.)

By the Court, SANDERSON, J.:

Ejectment to recover a parcel of land, part of the Rancho San Leandro, situated in Alameda County. It was tried without a jury and comes here upon the pleadings and a special finding of facts, unaccompanied by any evidence, except a map or diagram showing the lines of the Rancho San Leandro as surveyed by the Surveyor-General of the United States and confirmed by the District Court of the United States for the Northern District of California, the lines of a patent from the State of California, under which the defendants in part claim, the lines of the tract in dispute, the line of State segregation of swamp and overflowed lands, at that point, and the lines of

the spring and ordinary high tides of the Bay of San Francisco, by which the land is bounded on the west.

Upon the facts as found the Court gave the plaintiff judgment for seventeen eighteenths undivided. The defendants claim that the judgment should have been for them as to a part of the demanded premises, if not as to the whole.

The case is as follows: In 1842 the Rancho of San Leandro was granted in colonization by Juan B. Alvarado, then Governor of Upper California, to José Joaquin Estudillo. Said grant was presented to the Board of Commissioners appointed under the Act of Congress passed March 3d, 1851, and was confirmed by said Board on the 9th of January, 1855. Said grant was also confirmed by a decree of the District Court of the United States on appeal, which decree afterwards became final. In the decree of the Board, and also of the Court, the ranch was described as bounded on the west by the bay. ("*Mare.*") A survey was afterwards made by the Surveyor-General of the United States for the State of California and confirmed by the District Court of the United States. The land in suit fronts on the Bay of San Francisco and is within the lines of this survey. The plaintiffs hold the Estudillo title to seventeen eighteenths undivided.

The defendants entered upon the land in 1852. At that time, (and still,) at and near the place where the land is situated there was a salt water pond, covering several hundred acres, including a part of the land in suit, into which the tide waters of the bay flowed at flood tide and returned at ebb tide, through a slough about two feet wide and fifteen or twenty rods long. On the west side of the slough there was a ridge of sand extending from the slough along the shore of the bay in a northerly direction and connecting with a road at the main land. At the slough this ridge rose into a knoll, or mound, three or four feet higher than the surrounding ground, which, inside of the ridge, was marsh. From the knoll to the main land the ridge was broken at places and crossed by small sloughs or gullies, caused by the action of the tides, but

47

it was the path or way by which the natives of the country, on horseback and in wagons, passed from the main land to the knoll, and thence across the slough, by which the salt water pond was fed, into the country beyond. This knoll was used by the defendants as a shipping point for freight to and from San Francisco. To improve it for that purpose they widened the slough, constructed a wharf, and raised the knoll by covering it with sand, gravel and shells to the depth of several feet. They also drove piles between the knoll and the bay to protect the former from the action of the tides, and on it built a warehouse in 1856. They also filled up the gullies in the ridge between the knoll and main land, and have since maintained a road over the same suitable for hauling freight to and from their warehouse.

A part of the land in suit is covered and uncovered by the flow and ebb through the slough of the neap or ordinary tides, which occur twice every twenty-four hours. A still larger part is covered and uncovered by the flow and ebb of the spring tides, which occur at or about the new and full moon. The remainder, including the knoll and ridge, is not reached by the tides, but is all within the segregation of swamp and overflowed land made at that point by the State.

The defendants obtained a patent from the State on the 4th of May, 1857, which covers the land in controversy, and purports to convey it as swamp and overflowed land.

After this action was brought they also acquired a one thirty-sixth undivided interest in the San Leandro grant.

In view of the foregoing facts the Court below held that the defendants took nothing by their patent as against the plaintiff's title. Hence this appeal.

From the foregoing statement it is clear that there are no circumstances connected with this case which distinguish it from the case of *Teschemacher* v. *Thompson*, 18 Cal. 11. The land in suit in that case was in all respects of the same character as that involved in this, and the titles of the parties in both cases are of the same character and come from the same source respectively. It was there held in substance that the

transfer of the sovereignty over the country from the Mexican Government to the United States did not affect the rights of the inhabitants to their property, but, on the contrary, that such rights, both by the law of nations and by the stipulations of the treaty of Guadalupe Hidalgo, remained the same after the transfer of the sovereignty as before, and were to the same extent entitled to the protection of the new sovereign as of the former. That, under the obligations imposed by the law of nations and the stipulations of the treaty, the United States was bound not only to recognize and respect perfect titles acquired by the inhabitants of the country under Mexican domination, but also to recognize and respect such equitable claims as had their origin in the action of the Mexican Government, but were inchoate and imperfect at the date of the succession, and to take such steps as might be necessary in order to perfect the same as fully as they would or could have been had the sovereignty of the country remained unchanged. That the obligation thus cast upon the Federal Government had been performed through the operation of the Act of Congress of the 3d of March, 1851, and subsequent legislation creating a Board of Commissioners and vesting them with power to inquire, in the appointed mode, into the validity of such claims and to admit or deny the same, and in the former event that the proceedings so had became the record of the action of the Government in the premises, and as such conclusive upon the Government and upon all persons claiming under the Government by title subsequent. This has become the settled law of this State and of the United States as recently determined by the Supreme Court of the United States in the case of *Beard* v. *Federy*, decided at the December term, 1865. (3 Wallace, 478.)

From the foregoing it results that the State of California came into the Union with her claim to the lands within her borders, such as she took by virtue of her admission under general grants to all the States previously made by the Federal Government, and such as might thereafter be granted from the same source, and such as she then acquired by virtue of

her sovereignty, subordinate to the prior equities of grantees under the former sovereign, and bound by such action as the Federal Government might take in ascertaining and settling such equities. In private proprietorship and in sovereign right the United States succeeded the Mexican Government, and in both these respects California, so far as she acquired any right in either, succeeded the United States and became privy to the latter in estate in respect to all lands within her borders, whether such as may be held in private or sovereign right. In this respect no distinction can be made between the lands acquired by her through Federal grants and such as she took by virtue of her sovereignty. In respect to the latter, as in respect to the former, the United States succeeded to the title and took it upon precisely the same terms upon which the Mexican Government held it at the date of the cession. And so of the State. If the Mexican Government had made any rightful disposition of lands which she held as sovereign, neither the United States nor the State, as succeeding sovereigns, could disregard it any more than in the case of other lands. But by this we do not desire to be understood as holding that the Mexican Government, or this State, has the same power of absolute alienation over lands held in virtue of their sovereignty which they have over other lands. The land which the State holds by virtue of her sovereignty, as is well understood, is such as is covered and uncovered by the flow and ebb of the neap or ordinary tides. Such land is held by the State in trust and for the benefit of the people. The right of the State is subservient to the public rights of navigation and fishery, and theoretically, at least, the State can make no disposition of them prejudicial to the right of the public to use them for the purposes of navigation and fishery, and whatever disposition she does make of them her grantee takes them upon the same terms upon which she holds them, and of course subject to the public rights above mentioned. But this restriction does not prevent her from disposing of them so as to advance and promote the interests of navigation. On the contrary such a disposition of them would be in keep-

ing with the purposes of the trust in which she holds them. Nor of reclaiming them from the sea, where it can be done without prejudice to the public right of navigation, and applying them to other purposes and uses. There are large tracts of salt marsh lands, of which the land in suit is an example, which are covered and uncovered by the flow and ebb of the neap tides, and therefore belong to the State by virtue of her sovereignty, which are of no possible use for the purposes of navigation, but may be valuable for agricultural or other purposes if reclaimed from the tides. Such lands the State may undoubtedly grant in private ownership for the purposes of reclamation and use, for by such a course no right of the public to their use for the purposes of navigation would be prejudiced. On the contrary, the right of navigation, in many cases, might be subserved by such reclamation.

We find no error in the record, and the judgment must be affirmed.

Ordered accordingly.