[L. A. No. 23176. In Bank. Apr. 5, 1955.]

FELIX MALLON, Plaintiff and Appellant, v. CITY OF LONG BEACH (a Corporation) et al., Respondents; ALMA SWART, Intervener and Appellant.

Stratton & Taylor, Chas. C. Stratton and Mark L. Taylor for Plaintiff and Appellant.

Theodore R. Gabrielson and Kenneth E. Matot for Intervener and Appellant.

Preston, Braucht & George, Crowe, Mitchell & Hurlbutt, Neil Cunningham and J. Thomas Crowe as Amici Curiae on behalf of Intervener and Appellant.

Edmund G. Brown, Attorney General, E. G. Benard, Assistant Attorney General, Leonard M. Friedman and George G. Grover, Deputy Attorneys General, as Amici Curiae on behalf of Appellants.

Walhfred Jacobson, City Attorney, Joseph B. Lamb, Assistant City Attorney, Atlee S. Arnold, Deputy City Attorney, O'Melveny & Myers, Louis W. Myers, Pierce Works and William W. Alsup for Respondents.

Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones and Arthur W. Nordstrom, Assistant City Attorneys, as Amici Curiae on behalf of Respondents.

TRAYNOR, J.—Plaintiff and plaintiff in intervention appeal from a judgment for defendants entered after defendants' demurrers to their complaints were sustained without leave to amend. Plaintiffs sought to enjoin defendants from appropriating and expending for general municipal purposes the income derived from the sale of oil and gas produced from the tide and submerged lands granted in trust to the city of Long Beach by the State of California. (Stats. 1911, p. 1304, as amended by Stats. 1925, p. 235, Stats. 1935, p. 793, and Stats. 1951, p. 2443.) The expenditures to which plaintiffs object are purportedly authorized by a duly enacted amendment to the charter of the city of Long Beach, the material parts of which provide:

"The 'Public Improvement Fund' is hereby created and established. . . . Money placed therein shall be used exclusively for the payment of costs and expenses for the acquisition, construction, reconstruction, development, operation, repair and maintenance of public improvements and the acquisi-

tion of such lands, rights and property as may be necessary or convenient therefor. . . .

"Within thirty days after the effective date of this section, the City Treasurer shall transfer to the 'Public Improvement Fund' fifty per cent of all revenue derived by the City from oil, gas and other hydrocarbons, and fifty per cent of the interest, earnings, income and/or profits from investment of said revenue which is in the 'Harbor Revenue Fund' on the date of such transfer. Within said thirty days, he shall also transfer to the 'Public Improvement Fund' fifty per cent of all revenue in the 'Harbor Reserve Fund' and the 'Tideland Oil Fund' on the date of such transfer.

"At least once each calendar month thereafter, the City Treasurer shall transfer to the 'Public Improvement Fund' fifty per cent of all revenue derived by the City from oil, gas and other hydrocarbons and placed in the 'Harbor Revenue Fund,' which is not required by this Charter to be transferred from said 'Harbor Revenue Fund' to the 'Harbor Reserve Fund.' He shall also transfer to the 'Public Improvement Fund,' at least once each calendar month thereafter, fifty per cent of all revenue so derived, which is required by this Charter to be transferred to the 'Harbor Reserve Fund' and fifty per cent of all revenue, so derived, which is required by this chapter to be placed in the 'Tideland Oil Fund.' " (Charter of the city of Long Beach § 260.8, approved by concurrent resolution of the Legislature [Const., art. XI, § 8], Stats. 1953, p. 3826.)

The Harbor Revenue Fund (Stats. 1931, p. 2807), the Harbor Reserve Fund (Stats. 1949, p. 2857), and the Tideland Oil Fund (Stats. 2d Ex. Sess. 1946, p. 367; Stats. 1949, p. 2857) are depositories of the income derived from the production of oil and gas from the tide and submerged lands granted to the city by the state, except for the income derived from the production of "dry gas" from those lands, which is handled separately and is discussed below. Plaintiffs claim that the transfers authorized by this charter amendment and the expenditures pursuant thereto are unlawful. Defendants contend that the type of expenditures enumerated in the amendment are proper ones for a municipality to make, and that the transfers ordered by the amendment are authorized by chapter 915 of the Statutes of 1951. That statute provides:

"Section 1. It is hereby found and determined: That the City of Long Beach since 1939 has produced and is now producing large quantities of oil, gas and other hydro-

carbon substances from lands conveyed to said city by [the statutes cited above]. That from the revenue derived therefrom, said city has constructed upon said lands, wharves, docks, piers, slips, quays, and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation, at a cost of approximately thirty-five million dollars ($35,000,000). That said city has available and unexpended approximately seventy-five million dollars ($75,000,000), also derived from said source, for the uses and purposes required by said acts, and is now receiving and will continue to receive for many years approximately twenty-four million dollars ($24,000,000) per annum from said source. That, in addition thereto, said city obtains large quantities of 'dry gas' derived from natural gas produced from said lands, which is sold by said city to domestic and other consumers. That by reason of the already large expenditure on such lands for the uses and purposes required by said acts, the large additional sums available and to become available throughout the years for such purposes, the expenditure of more than a total of fifty per centum (50%) of such revenue, received and unexpended and hereafter to become available for such uses and purposes, would be economically impracticable, unwise and unnecessary. That fifty per centum (50%) of all revenue heretofore derived and unexpended, and to be derived, by the City of Long Beach from oil, gas and other hydrocarbon substances, other than 'dry gas,' produced from lands conveyed by said acts, is no longer required for navigation, commerce and fisheries, nor for such uses, trusts, conditions and restrictions as are imposed by said acts. That none of the revenue heretofore derived, and to be derived, by said city from 'dry gas' obtained from said lands is any longer required for navigation, commerce and fisheries, nor for such uses, trusts, conditions and restrictions as are imposed by said acts.

"For the purposes of this act, 'dry gas' is defined to mean the gas directly produced from wells, which contains one-half of a gallon or less of recoverable gasoline per 1,000 cubic feet, or from which gasoline has been removed by processing.

"Sec. 2. That fifty per centum (50%) of all revenue heretofore derived and unexpended, and to be derived, by the City of Long Beach from oil, gas and other hydrocarbon substances, other than 'dry gas,' produced from lands conveyed by said above-entitled acts is hereby declared to be free from the public trust for navigation, commerce and

fisheries, and from such uses, trusts, conditions and restrictions as are imposed by any of said above-entitled acts. That all of the revenue heretofore derived, and to be derived, by said city from 'dry gas,' obtained from said lands is hereby declared to be free from the public trust for navigation, commerce and fisheries, and from such uses, trusts, conditions and restrictions as are imposed by any of said above-entitled acts.'' (Stats. 1951, pp. 2444-2445.)

The tide and submerged lands from which the monies in question are derived were originally owned by the State subject to a trust for purposes of commerce, navigation, and fisheries for the benefit of all the people of the state. (*City of Long Beach* v. *Morse,* 31 Cal.2d 254, 262 [188 P.2d 17]; *City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 614 [82 P.2d 362]; *Boone* v. *Kingsbury,* 206 Cal. 148, 183, 189 [273 P. 797]; *City of Long Beach* v. *Lisenby,* 175 Cal. 575, 579 [166 P. 333]; *People* v. *California Fish Co.,* 166 Cal. 576, 584 [138 P. 79], quoting from *Illinois Central R. Co.* v. *Illinois,* 146 U.S. 387, 452-453 [13 S.Ct. 110, 36 L.Ed. 1018].) The Legislature committed the administration of this trust to the city of Long Beach (*City of Long Beach* v. *Lisenby, supra,* 175 Cal. 575, 579; and see Pub. Resources Code, § 6875) by conveying the lands involved to the city in fee simple (*City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 613) subject to an express trust that they be devoted exclusively to the improvement of commerce, navigation, and fisheries for the benefit of all the people of the state. (*Ibid.*; *Atwood* v. *Hammond,* 4 Cal.2d 31, 37-38 [48 P.2d 20], and cases cited.) The lands granted included the minerals therein, which are also subject to the trust. (*City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 257-258; *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 614; *Trickey* v. *City of Long Beach,* 101 Cal.App.2d 871, 879 [226 P.2d 694].) Before the enactment of the 1951 statute, quoted above, we held that ''the proceeds from the sale of oil and gas from the lands in question may not be used for any purposes other than those specified in the trust conveyances under which the [city of Long Beach] claims title to the lands. The Legislature specified purposes relating to the harbor that it deemed beneficial to the state as a whole and did not authorize the city of Long Beach to use the corpus or the income of the trust for strictly local improvements.'' (*City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 262; see also *Trickey* v. *City of Long Beach, supra,* 101 Cal.App.2d 871, 880.)

The transfers and expenditures authorized by the 1953 amendment to the charter of the city of Long Beach are of the same character as those declared unlawful in the Morse case. (See Stats. 2d Ex. Sess. 1946, pp. 366, 367.) The lawfulness of those transfers and expenditures depends, therefore, on the validity and effect of the 1951 statute revoking in part the public trust on the income derived from the lands in question. Thus, the principal issues to be resolved in the present case are whether the revocation was a valid exercise of the legislative power, whether the revocation operated as a transfer from the state to the city of the monies affected thereby, and, if so, whether such a transfer would offend the constitutional prohibition against gifts of public monies.

■ It is well established that "[t]he trust in which tide and submerged lands are held does not prevent the state from reclaiming tide and submerged lands from the sea where it can be done without prejudice to the public right of navigation and applying them to other purposes and uses." (*Boone* v. *Kingsbury, supra,* 206 Cal. 148, 189; *Illinois Central R. Co.* v. *Illinois, supra,* 146 U.S. 387, 452-453; *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 41; *Oakland* v. *Oakland Waterfront Co.,* 118 Cal. 160, 183-185 [50 P. 277]; *People* v. *California Fish Co., supra,* 166 Cal. 576, 585-586; *Ward* v. *Mulford,* 32 Cal. 365, 372-373.) This principle has never been judicially applied in this state to the partial revocation of the public trust as to the income derived from the extraction of minerals imbedded in the lands subject to the trust, but the Legislature has devoted such income from tide and submerged lands held by the state to uses unconnected with the purposes of the public trust. (See Stats. 1921, chap. 303, § 19; Pub. Resources Code, § 6816.) Furthermore, we can see no real distinction between reclamation of peripheral lands that become, in the course of harbor development, unusable for purposes of the trust (*Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 40-41) and the reclamation of part of the minerals imbedded in the lands subject to the trust that likewise become unnecessary for the purposes of the trust. ■ Such a partial revocation of the trust will in no way impair the public interest in commerce, navigation, and fisheries in Long Beach harbor, and thus the revocation does not conflict with the manifest purposes of sections 2 and 3 of article XV of the Constitution. (See *People* v. *California Fish Co., supra,* 166 Cal. 576, 598; *Cimpher* v. *City of Oakland,* 162 Cal. 87, 90 [121 P. 374].)

■ Moreover; the Legislature has "found and determined"

that, to the extent affected by such partial revocation, the income derived from the production of oil and gas from the tide and submerged lands of Long Beach harbor "is no longer required for navigation, commerce and fisheries, nor for such uses, trusts, conditions and restrictions as are imposed by" the statutes granting the said tide and submerged lands in trust. (Stats. 1951, p. 2445.) That determination and finding is conclusive upon this court in the absence of evidence indicating that the abandonment of the public trust will impair the power of succeeding legislatures to protect, improve, and develop the public interest in commerce, navigation, and fisheries. (*County of San Diego* v. *Hammond*, 6 Cal.2d 709, 726 [59 P.2d 478, 105 A.L.R. 1155]; *Boone* v. *Kingsbury, supra,* 206 Cal. 148, 183; *People* v. *California Fish Co., supra,* 166 Cal. 576, 597; *Oakland* v. *Oakland Waterfront Co., supra,* 118 Cal. 160, 185.) ▮ Plaintiffs' sole contention on this point, that succeeding generations might have need for the monies thus freed from the trust for development and improvement of the state's harbors, waterways, and fisheries, is a matter of speculation and is insufficient of itself to overcome the legislative determination. Moreover, since the revocation in question does not contemplate or authorize the alienation of the tide and submerged lands free from the trust, succeeding legislatures can, if they deem it necessary for the purposes of the trust, reestablish the public trust on all the income derived from the production of oil and gas from the lands in question.

The next question is whether the revocation effected by the 1951 statute operates to transfer the monies involved to the state, as the plaintiff in intervention contends, or whether it operates as a transfer of those monies to the city of Long Beach, as defendants contend. In an early case concerning title to former pueblo lands, which the state held subject to a public trust for "*municipal* purposes," this court said that "[t]hrough such repeal [of the act by which the administration of the trust was transferred to the city of Monterey] the entire property held for public use—which would include the public lands—would revert to the state, and no limitation being imposed upon the legislature under the constitution of 1849* in that respect, could be then disposed of in any manner it saw fit." (*City of Monterey* v. *Jacks,* 139 Cal.

*The prohibition on "the making of any gift, of any public money or thing of value" (Const., art. IV, § 31) was not added to the Constitution until 1879.

542, 555-556 [73 P. 436], affirmed in 203 U.S. 360 [27 S.Ct. 67, 51 L.Ed. 220]; see also *San Francisco* v. *Canavan,* 42 Cal. 541, 554-556; *Hart* v. *Burnett,* 15 Cal. 530, 624.) In an early Kentucky case, concerning a grant of public lands for school purposes, similar reasoning was employed: "the legislature granted this land to the persons named in the trust for a certain purpose, and the title of the commonwealth did not pass from it to the grantees, except for that purpose; and, when the object of the trust became extinct, the title reverted to the commonwealth as a matter of law. . . . The reversion of title in such a case is . . . in consequence of the failure of the purpose for which it was granted." (*Kennedy* v. *McElroy,* 92 Ky. 72 [17 S.W. 202, 22 S.W. 442, 443].)

■ The reasoning in these cases is the same as that governing private trusts in which, in the absence of an express provision to the contrary, a revocation of the trust results in a reversion of the trust property to the settlor. (Civ. Code, § 2280; see 3 Scott on Trusts (1939), § 345.3.) That this reasoning applies to the trust on which the tide and submerged lands in question were conveyed to the city of Long Beach is indicated by the language in *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 257, that the "city is a trustee and as such 'assumes the same burdens and is subject to the same regulations that appertain to other trustees of such trusts.' [Citation.]" Defendants' reliance on the statement in *City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362], that the lands were granted to the city in fee simple, is therefore ill founded. It was clearly recognized in that case that the city's title in fee simple was subject to the public trust (11 Cal.2d at 613; and see *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 259), and the problem of the effect of a revocation of the trust was not then before the court. ■ Moreover, trustees normally hold title to the corpus of the trust in fee simple, but only for the purpose of carrying out the objects of the trust. (See *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 258.) When the trust is terminated, the corpus does not become the individual property of the trustee; it reverts to the settlor.

Defendants also contend that the dictum in *Atwood* v. *Hammond,* 4 Cal.2d 31, 44 [48 P.2d 20], that "the state could not by unilateral action divest the city of its title, nor annex a different use to this eighteen acre parcel [of reclaimed tidelands]," established the rule that although the state can terminate the public trust over such lands, the termination

of the trust results, not in a reversion to the state as grantor, but in the ownership by the city of an absolute title to the lands originally conveyed to it in trust. This contention is based on the assumption that, pursuant to a conveyance to it from the state of lands subject to a public trust, the city acquires property or. contractual rights that are beyond the power of the Legislature to alter. ▉ Even if a conveyance, such as the one to the city of Long Beach in the present case, from the state to a municipal corporation is considered as a contract between the city and the state or as creating property interests in the city, the state acting through the Legislature has the power to alter contractual or property rights acquired by the municipal corporation from the state for governmental purposes. (*County of Alameda* v. *Janssen*, 16 Cal.2d 276, 284 [106 P.2d 11, 130 A.L.R. 1141]; *Railroad Com.* v. *Los Angeles R. Corp.*, 280 U.S. 145, 156 [50 S.Ct. 71, 74 L.Ed. 234]; *Trenton* v. *New Jersey*, 262 U.S. 182, 188, 191-192 [43 S.Ct. 534, 67 L.Ed. 937, 29 A.L.R. 1471]; *Pawhuska* v. *Pawhuska Oil & Gas Co.*, 250 U.S. 394, 398-399 [39 S.Ct. 526, 63 L.Ed. 1054]; *Hunter* v. *Pittsburgh.* 207 U.S. 161, 178-179 [28 S.Ct. 40, 52 L.Ed. 151] and cases cited: *New Orleans* v. *New Orleans Water Works Co.*, 142 U.S. 79, 91 [12 S.Ct. 142, 35 L.Ed. 943]; see also *Brooklyn & Richmond Ferry Co.* v. *United States*, 167 F.2d 330, 333; Schulz, *"The Effect of the Contract Clause and the Fourteenth Amendment Upon the Power of the States to Control Municipal Corporations,"* 36 Mich.L.Rev. 385, 387-398, 408.)

▉ A municipal corporation has no privileges or immunities under the United States Constitution that it can invoke against the will of the state (*Williams* v. *Mayor & City Council of Baltimore*, 289 U.S. 36, 40 [53 S.Ct. 431, 77 L.Ed. 1015]), and under the California Constitution a freeholder city, such as the city of Long Beach, is exempt from legislative control only as to "municipal affairs." (Const., art. XI, § 6; *Eastlick* v. *City of Los Angeles*, 29 Cal.2d 661, 665 [177 P.2d 558, 170 A.L.R. 225] and cases cited.) ▉ It is clear in the present case that any interest of the city of Long Beach in the tidelands was acquired not as a "municipal affair," but subject to a public trust to develop its harbor and navigation facilities for the benefit of the entire state, and was therefore subject to the control of the Legislature. (*City of Monterey* v. *Jacks, supra,* 139 Cal. 542, 555-556.)

Moreover, the construction of the 1951 statute for which defendants contend would result in its unconstitutionality.

If the statutory revocation operates as a transfer of the monies affected thereby to the city of Long Beach, such a transfer would be a gift of public monies in violation of section 31 of article IV of the Constitution.* Defendants argue that the development of the harbor without ·expense to the state was sufficient consideration for the original grant of the lands in trust, and that, the grant having thus been made, the state had nothing more of value to convey and the 1951 statue merely released certain conditions and restrictions on the original grant. Although the question of gift has never been directly discussed in any of the cases, it is clear that grants in trust of tide and submerged lands to municipal corporations have been made in furtherance of the interest of the entire state in the development of its harbors and thus such grants do not violate the constitutional prohibition against gifts. (See *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 262; *Miller* v. *Stockburger,* 12 Cal.2d 440, 444 [85 P.2d 132] ; *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 45; *Oakland* v. *Oakland Waterfront Co., supra,* 118 Cal. 160, 189; *City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23, 29 [102 P.2d 438].) Defendants contend, however, that the transfer to the city of the monies released from the trust by the 1951 statute would not violate the constitutional prohibition against gifts because the state had nothing of value to convey and the city received nothing of value by reason of that statute. There is no merit in this contention. If, as defendants contend, the city is entitled to those monies, it is entitled to them by reason of the statute. If defendants' interpretation of the statute is the correct one, the city now has available for general municipal expenditures millions of dollars that were not available to it before the enactment of the 1951 statute. (*City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 262.) There being no benefit to all the people of the state from such a transfer, it would be a gift of public monies and thus prohibited by the Constitution.

*County of Los Angeles* v. *Southern Calif. Tel. Co.,* 32 Cal. 2d 378 [196 P.2d 773], on which defendants rely, is not inconsistent with this conclusion. That case involved the validity of franchises acquired under the provisions of section 536 of the Civil Code. In holding that such franchises are not gifts within the meaning of section 31 of article IV, we

---

*"Sec. 31. The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever. . . .''

said that "the state is assured of a continuing benefit in return for the privileges granted under section 536. . . . The company must not only construct a telephone system but it must render service, and if it fails to do so the franchise terminates. Thus the state receives a benefit during the life of the franchise, since in order to retain it the company must continue to serve the public . . .

"Since the offer of a franchise in section 536, when accepted, results in a binding agreement supported by a valid consideration, there is no gift within the meaning of the constitutional prohibitions." (32 Cal.2d at 388.)

██ It is suggested, however, that the expenditures purportedly authorized by section 260.8 of the charter of the city of Long Beach are expenditures for public purposes and thus that a transfer of the funds in question from the state to the city would not be a gift within the meaning of section 31 of article IV of the Constitution. There is no merit to this contention. That section of the Constitution specifically forbids the making of a gift of public monies or thing of value to any *municipal corporation*, and all lawful expenditures of such corporations are necessarily for public purposes. Moreover, as we said in *City of Oakland* v. *Garrison*, 194 Cal. 298, 304 [228 P. 433], in reference to the appropriation of county funds for the improvement of a city street, "It is not sufficient, therefore, that the appropriation here in question be for a public purpose. It must also be for a purpose which is of interest and benefit generally to the people of the county of Alameda. The question, then, is whether the improvement of this particular street within the city of Oakland is a matter of such general county interest that the county funds may properly be expended therein."

██ Applying that principle to the present case, we cannot hold that the construction and establishment by the city of Long Beach of storm drains, a city incinerator, a public library, public hospitals, public parks, a fire alarm system, off-street parking facilities, city streets and highways, and other expenditures that have been authorized to be made from the "Public Improvement Fund," are of such general state-wide interest that state funds could properly be expended thereon. Such expenditures are for purely "municipal affairs" within the meaning of section 6 of article XI of the Constitution. (See *City of Grass Valley* v. *Walkinshaw*, 34 Cal.2d 595, 599 [212 P.2d 894] [sewer]; *Jardine* v. *City of Pasadena*, 199 Cal. 64, 68 [248 P. 225, 48 A.L.R. 509] [isola-

tion hospital] ; *Stege* v. *City of Richmond,* 194 Cal. 305, 312 [228 P. 461] [city streets] ; *City of Pasadena* v. *Paine,* 126 Cal.App.2d 93, 98 [271 P.2d 577] [city library] ; *Alexander* v. *Mitchell,* 119 Cal.App.2d 816, 826-827 [260 P.2d 261] [off-street parking facilities] ; *Perez* v. *City of San Jose,* 107 Cal.App.2d 562, 566 [237 P.2d 548] [city highways] ; *Beard* v. *City & County of San Francisco,* 79 Cal.App.2d 753, 755 [180 P.2d 744] [public hospital] ; *Armas* v. *City of Oakland,* 135 Cal.App. 411, 420 [27 P.2d 666, 28 P.2d 422] [fire protection].) Moreover, they are normal expenditures for a municipal corporation to make, and to hold that a grant of public monies from the state to defray such expenditures is not a gift within the meaning of section 31 of article IV of the Constitution would render meaningless the express prohibition therein against gifts to ''municipal corporations.'' We conclude, therefore, that in view of the intendments in favor of the constitutionality of a statute (*Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 636 [91 P.2d 577], and cases cited), we must adopt the construction of the 1951 statute indicated by *City of Monterey* v. *Jacks, supra,* 139 Cal. 542, 555-556, and we hold that the partial revocation of the trust effected by that statute necessarily results in a reversion to the state of the monies thus released from the trust, and the city holds those funds upon a resulting trust for the state. It is, therefore, unnecessary to consider plaintiffs' other constitutional objections to the construction of the statute urged by defendants.

 It remains only to consider the intervening plaintiff's contention that the provision in the 1951 statute, ''[t]hat all of the revenue *heretofore derived,* or to be derived, by said city from 'dry gas,' obtained from said lands is hereby declared to be free from the public trust. . . .'' [italics added], is an unconstitutional attempt to validate the past unlawful expenditure of such funds for general municipal purposes. (Const., art. IV, § 25 [16], [18].) It was held in *Trickey* v. *City of Long Beach,* 101 Cal.App.2d 871 [226 P.2d 694], that the income derived from the production of ''dry gas'' from the tide and submerged lands granted to the city was subject to the public trust for commerce, navigation, and fisheries, and that the expenditure of that income for general municipal purposes was unlawful. It follows from the conclusion reached above that as a result of the 1951 statute the city holds all of the funds ''heretofore derived, or to be derived'' from the production of ''dry gas'' from

the lands in question subject to a resulting trust in favor of the state.

The judgment is reversed.

Gibson, C. J., Edmonds, J., and Carter, J., concurred.

SPENCE, J.—I dissent.

In my opinion, the revenue in question from oil and gas production on tidelands, which lands had been previously granted by the state to the city of Long Beach, have been validly released by the Legislature from the trust, and the city may properly use the revenue so released for municipal improvements.

The precise question before us appears to be one of first impression, but I do not believe that the conclusions reached in the majority opinion can be reconciled with the decisions of this court in *Atwood* v. *Hammond,* 4 Cal.2d 31 [48 P.2d 20], and *City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362], nor with the implications of the more recent decision of this court in *City of Long Beach* v. *Morse,* 31 Cal.2d 254 [188 P.2d 17]. These and other authorities will be hereinafter discussed, but as the solution of the present problem involves a determination of the respective rights of the state and the city to the revenues which have been admittedly released from the trust, the fundamental question to be considered is that of the nature of the trust under which the tidelands are held. It appears to me that this question has been erroneously oversimplified in the majority opinion, which treats the state as the "trustor" or "settlor," and the Act of 1951 (Stats. 1951, p. 2443) as a "revocation," or at least a "partial revocation" of the trust, resulting in a "reversion" to the state of said revenues. This reasoning is based upon an assumed analogy in all respects between the trust upon which the tidelands are held and the ordinary private trust, but I can find no proper basis for such analogy. On the contrary, the trust involved here appears to be *sui generis,* and any attempt to determine the respective rights of the state and city upon such reasoning can lead only to confusion and to erroneous conclusions.

When the state embarked upon the program of granting the tidelands to local authorities, it was dealing only with those portions of land along the shore line which were submerged at high tide and exposed at low tide. It is a matter of common knowledge that there are little, if any, tidelands

at many points where the shore line is precipitous, and that the greatest areas of tidelands are found in and about our bays and at the mouths of our rivers, near which points many of our municipalities have developed. In their natural state, these tidelands were apparently of little value for any purpose, and were obviously of little value for navigation or commerce because of the relatively shallow water which covered them even when the tides were at their highest. Furthermore, the extent of the so-called tidelands has been subject to change over the years by reason of natural accretions to, or the wearing away of, the shore line, or by reason of artificial improvements by way of dredging and filling. In fact, the improvement of any tidelands for the purpose of navigation and commerce normally contemplates the artificial change of a part or all of such land into high land bordering upon water deep enough for the normal purposes of navigation and commerce. Hence, the state, in granting the tidelands to the local authorities, was dealing with lands having apparently little value and having irregular boundaries which could not be precisely and permanently delineated. The Legislature no doubt concluded that some of such lands should be improved and could best be improved in the interest of navigation and commerce by the local authorities which administered the lands bordering such tidelands. It therefore embarked upon its program, and the grants to the local authorities were accompanied with the express or implied undertaking that such lands would be so improved by the local authorities without expense to the state. Such was the express stipulation in the grant of the tidelands under consideration to the city of Long Beach. (*City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 257.) Pursuant to such undertaking, those lands have been extensively improved over the years by the city of Long Beach by the expenditure of tremendous sums of money.

In the light of these observations, let us consider the nature of the "trust" with which we are dealing. It has been said that these tidelands were acquired by the State of California by the act of admission, subject however to a trust for navigation, commerce and fishing. (*City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 614.) The precise nature of this trust has never been clearly defined, and, as above indicated, the trust appears to be *sui generis.* (See cases discussed in *Illinois Central R. Co.* v. *Illinois,* 146 U.S. 387 [113 S.Ct. 110, 36 L.Ed. 1018], and *Boone* v. *Kingsbury,* 206

Cal. 148 [273 P. 797].) Some things nevertheless appear certain. First, that the State of California was itself a trustee rather than a trustor in relation to any trust imposed upon such tidelands, and that the beneficiaries of such trust were not alone the people of this state but all the people of the United States. Thus, it has been indicated that the federal government could enforce such trust. (*Boone* v. *Kingsbury, supra,* 206 Cal. 148, 189.) Second, that the trust does not permanently attach to all the lands which were originally tidelands, for many of the areas embraced in the original tideland areas have been improved by developing such lands into high lands, and portions thereof have become either the property of municipalities (*Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 38) or of private owners (*Boone* v. *Kingsbury, supra,* 206 Cal. 148, 189), free of any trust when no longer necessary for the accomplishment of the trust purposes.

In determining the nature and extent of the trust imposed upon the tidelands, such lands should be distinguished from the lands involved in *United States* v. *California,* 332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889], which, under the complaint in that action, included only lands "lying seaward of the ordinary low water mark on the coast of California." (P. 22.) We are here concerned only with lands lying *shoreward* of such low water mark. While the trusts affecting both types of land may have a common origin, no question was raised in the cited case concerning the respective rights of the state and the federal government in "tidelands down to the low water mark." (P. 30.) Rather, the court merely refused to extend the law relating to the latter, as expounded in *Pollard's Lessee* v. *Hagan,* 3 How. (U.S.) 212 [11 L.Ed. 565], to cover the land there in controversy to the seaward of the low water mark.

The historical background of the trust in tidelands throws some light upon the peculiar nature of such trust. The original colonies acquired these tidelands by right of conquest, and after the conquest, such lands were held by them "as they were by the king, *in trust* for the public uses of navigation and fishery, *and the erection thereon* of wharves, piers, light-houses, beacons and other facilities of navigation and commerce. Being subject to this trust, they were *publici juris*; in other words, they were held for the use of the people at large. . . . It is also true that portions of the submerged shoals and flats, which really interfered with navigation, and could better subserve the purposes of commerce by being

filled up and reclaimed, were disposed of to individuals for that purpose. But neither did these dispositions of useless parts affect the character of the title to the remainder." (*Illinois Central R. Co.* v. *Illinois, supra,* 146 U.S. 387, 457, quoting from *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 F. 9, 19, 20.)

With respect to the tidelands of California, it was said that "upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits passed to the State, *with the consequent right to dispose of the title to any part of said soils* in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, as far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the general government." (*Illinois Central R. Co.* v. *Illinois, supra,* 146 U.S. 387, 465, quoting approvingly from *Weber* v. *State Harbor Comrs.,* 18 Wall. (U.S.) 57, 65 [21 L.Ed. 798].)

In *Boone* v. *Kingsbury, supra,* 206 Cal. 148, at page 180, in referring to "the title in the soil of the sea or arms of the sea," it is said that such title "at common law was vested in the sovereign in trust for the people"; and in referring to the title of the states and to the exhaustive study therein made of the entire subject, it quotes approvingly on page 180 from *Shively* v. *Bowlby,* 152 U.S. 1 [14 S.Ct. 548, 38 L.Ed. 331], as follows: "The foregoing summary of the laws of the original states shows that there is no universal and uniform law upon the subject; but that each state has dealt with the lands under the tide waters within its borders according to its own views of justice and policy. . . ."

In summary, it appears from these authorities that historically the title to the tidelands has been held by the sovereign subject to a trust which is defined in general terms as a trust for navigation, commerce and fishing; that the exact nature of the trust has never been clearly defined; that the main purpose of the trust is to maintain a shore line which is generally free from any substantial interference with the public enjoyment of navigation, commerce and fishing; that the sovereign may deal with the tidelands in almost any way so long as there is no substantial impairment of the trust purpose; and that any substantial impairment of the trust purpose in the tidelands within any state could be abated by the state or the federal government.

Concerning the California tidelands, we find that title to all of such lands, with the possible exception of title to those lands covered by prior Mexican grants, was acquired by the state by the act of admission following their acquisition by the United States under the Treaty of Guadalupe Hidalgo. In dealing with those lands in the early case of *Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160, at page 183 [50 P. 277], the court said: ". . . the several states hold and own the lands covered by navigable waters within their respective boundaries in their sovereign capacity, and primarily for the purpose of preserving and improving the public rights of navigation and fishery. They have in them a double right, a *jus publicum* and a *jus privatum.* The former pertains to their political power—their sovereign dominion, and cannot be irrevocably alienated or materially impaired. The latter is proprietary and the subject of private ownership, but it is alienable only in strict subordination to the former."

The same distinction between the state's sovereign and proprietary rights in tidelands was made in *Santa Cruz* v. *Southern Pac. Co.,* 163 Cal. 538, 544 [126 P. 362], and in *People* v. *California Fish Co.,* 166 Cal. 576, 597 [138 P. 79]. In its sovereign capacity, the state held these lands subject to a public trust for navigation, commerce and fishing; and it could not completely divest itself of its responsibilities as such trustee to the impairment of the public interest. (*Boone* v. *Kingbury, supra,* 206 Cal. 148, 183, 189; *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 614.) However, in its proprietary capacity and as the proprietary owner, the state could grant the tidelands to a municipality subject to this public trust. (*Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 37; *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 614-615.) This distinction between the state's sovereign and proprietary rights and duties in respect to the tidelands was not considered material for the purpose of the decision in *City of Long Beach* v. *Marshall, supra* (see pp. 614-615), but as will hereinafter appear, such distinction is important in the determination of the question presented here.

Various legislative acts, other than the Act of 1951 (Stats. 1951, p. 2443), affecting the Long Beach tidelands have been discussed in numerous cases. (*City of Long Beach* v. *Lisenby,* 175 Cal. 575 [166 P. 333]; *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609; *Miller* v. *Stockburger,* 12 Cal.2d 440 [85 P.2d 132]; *City of Long Beach* v. *Morse, supra,* 31 Cal.

2d 254.) Such discussion will not be repeated here except insofar as it affects the particular problem before us.

In *City of Long Beach* v. *Marshall, supra*, 11 Cal.2d 609, at page 616, it was said: "It remains only to point out briefly that the history of tideland grants in this state, and the actions of the various legislatures and the courts in connection therewith, show a general agreement that the tidelands were conveyed to municipalities in fee, subject only to the public trusts and the limitations and reservations specified in the acts; and that until the discovery of these valuable oil rights in the Southern California tidelands no serious doubt was ever expressed as to the title of the municipalities."

The Marshall case was brought on the theory that "the rights in oil and other minerals belonged to the state and not to the city" (p. 612), and such theory was held untenable. (See also *Miller* v. *Stockburger, supra*, 12 Cal.2d 440.) The court there said at page 613, in speaking of this original grant to the city of Long Beach in 1911 (Stats. 1911, p. 1304): "Giving this language its ordinary and reasonable meaning, it would seem clear that the state intended to and did convey whatever title or interest it had in these lands to the city, in fee simple, subject to certain conditions and upon certain trusts." It follows from the two cited cases that ever since the original grant in 1911, the rights in the oil and other minerals under the Long Beach tidelands and the proceeds from the extraction thereof have belonged to the city, rather than to the state, subject only to the trust under which the city held such tidelands.

In *City of Long Beach* v. *Morse, supra*, 31 Cal.2d 254, the question of the right of the city to divert a portion of the proceeds of the production of oil and gas to the city's general "Public Improvement Fund" was before this court. That case arose prior to the Act of 1951 (Stats. 1951, p. 2443) and before there had been any express declaration by the Legislature that such proceeds were no longer necessary for the trust purpose. This court there said at pages 257 and 258: "If the proceeds from the sale of oil and gas are regarded as corpus (see Rest. Trusts, § 238; Bogert, Trusts and Trustees, §§ 789, 828), they must be used for the purposes set forth in the legislative grants in trust, for the city, as trustee, clearly has no authority to appropriate the corpus to its own uses contrary to the terms of the trust. If the proceeds are regarded as income from trust property, the trustee, *in the absence of a legislative provision to the con-*

*trary,* has no more right to them than it has to the corpus.''
(Emphasis added.)

Since the decision in *City of Long Beach* v. *Morse, supra,* there has been enacted such ''legislative provision to the contrary.'' In 1951 (Stats. 1951, p. 2443), the Legislature released a portion of such proceeds from the trust, being the precise portion which is in controversy here. By that act the Legislature expressly found and determined that from the revenue derived from oil production from the tidelands, the city has constructed upon these lands various harbor facilities ''necessary or convenient for the promotion of commerce and navigation'' at a cost of approximately $35,000,000; that from the same source the city has now available and unexpended approximately $75,000,000; that it will continue to receive from the same source for many years to come approximately $24,000,000 per annum; that in addition, the city obtains large quantities of ''dry gas'' derived from the natural gas produced from said lands, which it sells; that in view of the already large expenditures on these lands for harbor improvements and the available and anticipated sums, the expenditures of more than 50 per cent of the revenue from the oil production for trust purposes would be ''economically impracticable, unwise and unnecessary''; that ''50% of all revenue'' from the oil produced on these tidelands and ''all of the revenue . . . derived from 'dry gas' . . . is hereby declared to be free from the public trust for navigation, commerce and fisheries, and from such uses, trusts, conditions and restrictions as are imposed by any of said above-entitled acts.'' (Stats. 1951, pp. 2444-2445.)

It was clearly within the power of the Legislature to release such portion of the city's income from the trust upon finding that such portion was no longer required for the purposes of the trust. (*Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 35-36, 39, 41-42; *Illinois Central R. Co.* v. *Illinois, supra,* 146 U.S. 387, 452-453.) In the Atwood case, the Legislature had made a similar declaration with respect to a portion of the San Diego tidelands, releasing them from the trust. (Stats. 1929, ch. 642, p. 1058.) This court there said at pages 42 and 43: ''We are of the view that it was competent for the legislature upon finding that the eighteen-acre tract was 'not longer required for navigation, commerce or fisheries,' to free it from the public easement for those purposes.'' It was further held that the Legislature could not thereafter deal with such land upon the theory that the state owned

the land so released from the trust. If then the Legislature may validly release a portion of the tidelands themselves from the trust upon finding that such lands are no longer required for trust purposes, it follows that the Legislature may validly release a portion of the proceeds of such tidelands. Such was the necessary implication of this court in *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, when it predicated its decision there on the "absence of a legislative provision" expressly finding that such proceeds were no longer required for trust purposes and releasing them from the trust.

The power of the Legislature to make such declaration under appropriate circumstances is derived from its sovereignty and the duty imposed upon it in accepting the tidelands under the act of admission, subject to the public trust. It is true that this court, in discussing the possible distinction between the state's sovereign and proprietary rights in *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, said at page 614: "There is neither logic in, nor practical necessity for the 'double fee' doctrine"; and on page 615 said, in speaking of the grant to the city: Such language cannot be distorted to mean that the *grant to the city* is only of rights of sovereignty in the sense of political or governmental power. The argument of the state's 'double fee' is met by the very statutory language which grants the land, for it conveys 'all' the 'right, title and interest' of the state. Whatever the state had by way of title or interest, however, divided it may have been, it all passed under the plain words of the grant." That language should be read in the light of the problem then before the court, and it should not be interpreted so broadly as to declare that the state, acting in its sovereign capacity, did not retain the power and duty to determine when any portion of the tidelands might be declared no longer necessary for trust purposes, and therefore be released from the trust. That the state in its sovereign capacity retained such power and duty is clearly indicated in several cases. (*Boone* v. *Kingsbury,* 206 Cal. 148, 184, 191 [273 P. 797]; *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 38-43; *City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23, 29 [102 P.2d 438]; *Illinois Central R. Co.* v. *Illinois, supra,* 146 U.S. 387, 453-455), and is clearly implied in *City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, which was based upon the "absence of a legislative provision" finding that the proceeds were no longer required for trust purposes. As was said in *City of Newport Beach* v. *Fager, supra,* at page 29:

". . . by virtue of the prior grants to the city, the state has divested itself of all interest in such land *excepting its interest as the sovereign in protecting the public trust.*" (Emphasis added.) In other words, the only right reserved by the state with respect to the tidelands or their proceeds was its sovereign right to protect the trust and to declare when, if ever, any portion of such lands or their proceeds might no longer be required for the trust purposes and might be released from the trust without any substantial impairment of the trust purposes. In the present case the Legislature has exercised that right and has released the disputed proceeds by the 1951 enactment. (Stats. 1951, p. 2443.)

The majority opinion declares that the solution of the present problem depends upon "the validity and effect of the 1951 statute *revoking* in part the public trust on the income derived from the lands in question. Thus, the principal issues to be resolved in the present case are whether the *revocation* was a valid exercise of the legislative power, whether the *revocation* operated as a *transfer from the state to the city* of the monies affected thereby, and, if so, whether such a *transfer* would offend the constitutional prohibition against gifts of public moneys." (Emphasis added.)

Thus the entire majority opinion is based upon the theory that the Act of 1951 was a partial "revocation" of a trust created by the state and a "transfer from the state to the city of the monies affected thereby." I agree that the solution of the problem depends upon the validity and effect of the 1951 statute, but I cannot agree with the reasoning of the majority opinion. It treats the state as the "trustor" or "settlor," with the property reverting "to the settlor" upon the termination of the trust; whereas, as heretofore indicated, the state was itself only a trustee with respect to the public trust under which the tidelands were previously held by it, and it had previously conveyed all its proprietary interest to the city. This court has clearly declared that the title to the tidelands, and therefore to the proceeds thereof, was thereafter in the city, not the state, subject only to the trust, for "whatever the state had by way of title or interest, . . . it all passed under the plain words of the grant" to the city of Long Beach; and that such conveyance carried with it "the mineral rights in the land." (*City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609, 615, 616.)

It follows that the Act of 1951 was not a "revocation" of any trust in any true sense of the word. The state was

not the trustor or settlor to which the lands or their proceeds would revert upon the termination of the trust. It is true that the state's grant to the city employed the words "in trust for the uses and purposes and upon the express conditions following . . ." (*City of Long Beach* v. *Morse, supra,* 31 Cal.2d 254, 256); but the grant did not create the trust, which already existed and under which the state itself held the property as trustee, and said grant merely imposed such conditions as the state deemed necessary to protect such preexisting public trust. Following the grant to the city the tidelands and the proceeds therefrom belonged to the city of Long Beach, subject only to the trust, and hence the exercise of the sovereign power by the state in 1951, in declaring a portion of the proceeds released from the trust, did not in any sense effect a "transfer" of anything "from the state to the city." It therefore appears that the claim that the Act of 1951 was invalid under section 31 of the Constitution cannot be sustained. The majority opinion concedes that the original grants of the tidelands to the cities "do not violate the constitutional prohibition against gifts," and it follows that the exercise by the state of its power to release a part of the tidelands or the proceeds from the trust is merely an exercise of the limited power retained by the state in its sovereign capacity following the original grant of all its right, title and interest in said tidelands. The validity of such a release was sustained in *Atwood* v. *Hammond, supra,* 4 Cal.2d 31.

It may be conceded that the majority opinion, by starting from an erroneous premise, reads quite plausibly. The erroneous premise, however, appears to be unfortunate, for the premise itself does violence to the principles laid down in the authorities, and more particularly to those clearly enunciated in *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, and *City of Long Beach* v. *Marshall, supra,* 11 Cal.2d 609. Furthermore, the conclusions reached run contrary to the principles laid down in those cases and the other authorities above cited. These authorities sustain the judgment of the trial court.

It may well be that the state, as a matter of policy, should have reserved to itself the mineral rights in the Long Beach tidelands. It has made such reservation in later grants to other cities and counties, such as Santa Barbara (Stats. 1931, p. 1742), Ventura (Stats. 1935, p. 869), and Santa Cruz (Stats. 1935, p. 1876). The fact remains, however, that the state did

not make any similar reservation in the grant to the city of Long Beach, and I find no justification for now declaring, contrary to the principles enunciated in the prior decisions of this court, that the state has any right, title or interest therein or to the proceeds therefrom.

In my opinion, the judgment of the trial court should be affirmed.

Schauer, J., concurred.

SHENK, J.—I concur in the dissenting opinion of Mr. Justice Spence and deem it unanswerable. A further word seems desirable from my standpoint.

When *Boone* v. *Kingsbury* was decided by this court in 1928 [206 Cal. 148 (273 P. 797)] I expressed the view as the sole dissenter that permits proposed to be issued by the state for exploration and production of oil and gas from tidelands of the state would be inconsistent with the trust under which the state held those lands, namely, for commerce, navigation and fisheries. That case involved tidelands of the state outside of any municipality. It was there decided by the majority that the state owns those lands in fee subject only to the limited trust and that the granting of permits there sought to be issued by the state on a royalty basis for the production of oil and gas would not be inconsistent with the trust. The holding in that case has been the law of the state without deviation since that time. It has also been the law of the state that in granting to municipalities the tidelands within their borders the state conveyed the fee subject only to the same trust under which the state owned them. If leasing directly by the state for oil and gas production is not inconsistent with the trust the same rule should apply to a municipality occupying the same position as its grantor, the state. The case of *City of Long Beach* v. *Morse*, 31 Cal.2d 254 [188 P.2d 17], specifically left the way open for further legislation on the subject. That legislation was supplied by the Act of 1951 (Stats. 1951, p. 2443). By that enactment there is a legislative finding that the use of the proceeds from oil and gas production by the city of Long Beach is not in any way affected by the terms of the trust. If the city of Long Beach is bound by the terms of the trust, as the majority holds, the state likewise is bound by the same trust. The only logical deduction to be drawn from the majority opinion is that the trust relationship now de-

clared is also fastened on the state's title and right to the use of the proceeds from oil and gas development and production on tidelands.

Following the case of *United States* v. *California* in 1947 (332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889]) the United States granted to the several states bordering tidelands and to their grantees the right, title and interest of the federal government in and to such tidelands (Public Law No. 31, 67 Stats. p. 29, approved May 22, 1953). By that enactment the government reserved from the grant the right to exercise its constitutional powers over commerce and navigation and particularly stated in section 6 of the act that the reservation should ''not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specially recognized, confirmed, established, and .vested in and assigned to the respective States and others by section 3 of this Act.'' If the title of the city of Long Beach is encumbered by the trust, as the majority holds, the title of the State of California is also subject to the trust, and falls within the reservations of the act of Congress. The only way to avoid this conclusion is to declare, as we should, that the proceeds from oil and gas development here involved fall within the proprietary classification of the property of the city of Long Beach in accordance with the statutory and decisional law of the state and as contemplated by the recent act of Congress.

The petition of Respondent City of Long Beach for a rehearing was denied May 4, 1955. Shenk, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.